IN THE
UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES        )
                           )         04-CR-464-6

v.                     )
                           )        Judge Elaine Bucklo

COREY EVANS        )

## COREY EVANS'S MOTION FOR A REDUCED SENTENCE
## UNDER SECTION 404 OF THE FIRST STEP ACT

COREY EVANS, by the Federal Defender Program and its attorney, Daniel P. McLaughlin, respectfully requests that this Court enter an order reducing his total custodial sentence from 324 months to time served. Under Section 404 of the First Step Act, Mr. Evans is eligible for a reduced sentence. Because *Apprendi* and *Alleyne* apply in the context of First Step Act litigation, and because Mr. Evans's guilty plea lacked specific quantity admissions that allow for the application of the enhanced penalty provisions included in 21 U.S.C. §§ 841(b)(1)(A) and (B), the Court's sentencing options are limited; Mr. Evans may not be sentenced to a term of imprisonment of greater than 5 years. Because Mr. Evans has already served more than 15 years in custody, he respectfully requests that this Court enter an order reducing his sentence to time served. In further support of this motion, Mr. Evans states the following:

### A.    Introduction

1.    Mr. Evans is currently serving a 324 month custodial sentence at the BOP's Federal Medical Center at Rochester. His scheduled release date is November 19, 2027.[1] Mr. Evans has been in custody for over 15 years; his sentencing hearing took place in 2006 and the record is clear that he was subjected to the mandatory penalty scheme that imposed a minimum of 10 years imprisonment for offenses involving 50 grams or more of crack cocaine. Mr. Evans is eligible for relief because the First Step Act of 2018 made the Fair Sentencing Act of 2010—and the changes it made to the mandatory penalty provisions applicable to crack offenses—retroactive. In other words, defendants who received sentences under the "old" crack sentencing regime (which necessitated 10 year sentences when a defendant's conviction was for 50 grams or more and a 5 year sentence when the conviction was for 5 grams or more) can now petition the sentencing court for a reduction and ask to be resentenced to receive the benefit of the Fair Sentencing Act's less severe penalty scheme. Mr. Evans qualifies for relief and, for the reasons that follow below, this Court can and should reduce his sentence.

### B.    Procedural History

2.    On February 8, 2005, Mr. Evans was charged by superseding

---

1 *See* https://www.bop.gov/inmateloc/ (last visited 7/14/2019). Mr. Evans can be searched by name or BOP Register Number (04032-789).

indictment with conspiracy to possess with intent to deliver in excess of 50 grams of crack cocaine, in excess of 1 kilogram of cocaine, in excess of 5 kilograms of heroin, and an unspecified quantity of marijuana, all in violation of 21 U.S.C. § 846. Dckt. #513, Count One. Mr. Evans was also charged with two "phone" counts, in which it was alleged that he used a telephone in furtherance of the drug conspiracy charged in Count One, in violation of 21 U.S.C. § 843(b). *Id.* at Counts Four and Ten. At the time the superseding indictment was returned, Mr. Evans was already in custody: he was arrested on May 12, 2004, following the filing of the criminal complaint in this matter. PSR at 13-17; Dckt. #34. Mr. Evans has remained in custody since that time.

3.     Mr. Evans pled guilty on May 18, 2005. Dckt. #841. Mr. Evans's guilty plea was a "blind plea" that was entered orally: there is no written plea agreement or plea declaration. The transcript from his change of plea is attached as Exhibit 1, and is also available at Docket #2085.

3.     On November 17, 2006, this Court held Mr. Evans's sentencing hearing and imposed a sentence of 325 months in the custody of the BOP, to be followed by 60 months of supervised release. Dckt. #1651. The transcript from Mr. Evans's sentencing hearing is attached as Exhibit 2, and is docketed at entry #1731 (an electronic copy is not available through Pacer, but counsel was able to obtain a previously prepared copy through the Clerk's office).

4.     Mr. Evans pursued a direct appeal that challenged his sentence and focused upon the manner in which the sentencing guidelines were calculated. *United States v. White, et al.*, 582 F.3d 787, 805-06 (7th Cir. 2009). Mr. Evans's appellate counsel filed an *Anders* brief and, as a result, the Seventh Circuit's review of the issues was limited. *Id.* The Court granted Mr. Evans's counsel's motion to withdraw and dismissed his appeal. *Id.* at 807-08.

5.     Mr. Evans also filed a *habeas* appeal in 2011, and asked this Court to vacate or correct his sentence, which he argued was the result of ineffective assistance of counsel. *Evans v. United States*, No. 11-C-2425 (N.D. Ill.; Bucklo, J.). The arguments Mr. Evans raised in his *habeas* petition mirrored the issues raised in his direct appeal and focused on the litigation of his sentencing hearing, the calculation of the guidelines, and the ultimate sentence imposed. On July 15, 2011, this Court denied Mr. Evans's *habeas* petition and declined to issue a certificate of appealability. No. 11-C-2425, Dckt. #14 at 13. The Seventh Circuit subsequently denied Mr. Evans's request for a certificate of appealability. *Evans v. United States*, No. 11-3185 (7th Circuit Jun. 18, 2012)(Easterbrook, C.J.), Dckt. #8.

6.     On January 19, 2016, this Court reduced Mr. Evans's custodial sentence from 325 months to 324 months pursuant to Amendment 782 of the sentencing guidelines, which made retroactive changes to the drug quantity

table. Dckt. #2544 at 2-3. The Court left the rest of Mr. Evans's sentence unchanged.

###### C.     Application of the First Step Act of 2018

7.     In November 2006, when Mr. Evans was sentenced by this Court, the mandatory minimum sentence triggered by a conviction involving 50 grams or more of crack was 10 years, and the maximum sentence was life. *See, e.g.*, PSR at 582-584.

8.     On August 3, 2010, the Fair Sentencing Act changed the statutory range applicable to crack offenses: in order to trigger the 10 year mandatory penalty (that was applied to Mr. Evans's case), a defendant had to be charged with 280 grams or more of crack. *See* 21 U.S.C. §841(b) (2011 or later). Defendants charged with lesser quantities (such as 50 grams) were no longer subject to the 10 year mandatory-minimum (the statutory range for such offenses became 5 to 40 years' imprisonment). Those revisions did not apply to Mr. Evans because he was sentenced in November 2006, well before the Fair Sentencing Act became law.

9.     The First Step Act, which was signed into law on December 21, 2018, provides in Section 404 that "a court that imposed a sentence for a covered offense may, on motion of . . . the defendant . . . impose a reduced sentence as if sections 2 and 3 of the Fair Sentencing Act of 2010 (public Law

5

111-220; 124 Stat. 2372) were in effect at the time the covered offense was committed." First Step Act of 2018, P.L. 115-391, § 404(b). The term "covered offense" is defined as "a violation of a Federal Criminal statute, the statutory penalties for which were modified by section 2 or 3 of the Fair Sentencing Act of 2010… that was committed before August 3, 2010." First Step Act of 2018, P.L. 115-391, § 404(a).

Mr. Evans was convicted in 2005 for a drug offense that took place between 1989 and 2004. Dckt. #513 at ¶1. Under the Fair Sentencing Act of 2010—made retroactive by the First Step Act of 2018—the statutory penalties that were applied to the crack charged in Mr. Evans's case have changed. Since the statutory penalty scheme that was applied by the Court has been modified, Mr. Evans is within the class of defendants affected by Section 404.

10.     The fact that Mr. Evans was charged in a conspiracy involving multiple substances (crack, heroin, powder, and marijuana) does not change this analysis or make him ineligible for relief. *See, e.g.*, *United States v. Allen*, No. 96-CR-149-RNC-3, 2019 WL 1877072, **1-3 (D. Conn. Apr. 26, 2019)(finding defendant eligible for relief under First Step Act despite his 1997 conviction on drug conspiracy count that charged 50 grams or more of crack and 5 kilograms or more of powder cocaine).[2]

---

2 Opinion attached as Exhibit 3.

**D.** **Apprendi and Alleyne apply in First Step Act Proceedings.**

11.     In *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), the Supreme Court ruled that any fact that increases the penalty beyond the otherwise-applicable statutory maximum must be proven beyond a reasonable doubt. In other words, the penalty faced by a defendant could not be increased unless the facts relied upon to increase the penalty was proven beyond a reasonable doubt—either by a jury or through a specific admission by the defendant. The Court extended *Apprendi's* holding in *Alleyne v. United States*, 570 U.S. 99, 103 (2013), when it held that any fact that increases the applicable mandatory minimum penalty is an "element" of the crime that must be submitted to the jury (or specifically admitted by the defendant). "[A]ny fact that increases the mandatory minimum is an 'element' that must be submitted to the jury." *Alleyne*, 570 U.S. at 103.

12.     The holdings of *Apprendi* and *Alleyne* are applicable in the context of motions brought under the First Step Act. *See, e.g.*, *United States v. Herbert*, No. 97-CR-30024, 2019 WL 2718498, *2 (W.D. Va. Jun. 28, 2019); *United States v. Johnson*, No. 01-CR-543, 2019 WL 2590951, *3 (N.D. Ill. Jun. 24, 2019)(Leinenweber, J.);[3] *Allen*, 2019 WL 1877072 at *4. This is, in part, because *Apprendi* and *Alleyne* "recognize[] a constitutional rule" that "has

---

3 Opinions attached as Exhibits 4 and 5.

7

existed since the adoption of the Constitution." *United States v. Stone*, No.

96-CR-403, 2019 WL 2475750, *2 (N.D. Ohio Jun. 13, 2019).[4]

> This is to say that allowing judges and not juries to determine what drug quantities have been proven in connection with a distribution has always been unconstitutional, even at the time of [the defendant's] original sentencing. The First Step Act neither directs nor implies that the Court should perpetuate the application of an unconstitutional practice when determining a new sentence that complies with the Act's directives, and many courts faced with the issue have applied the *Apprendi* rule in First Step resentencings.

*Id*. (citations omitted).

13.     The applicability of *Apprendi* and *Alleyne* is particularly

important in Mr. Evans's case, because Mr. Evans never admitted to his

responsibility for a specific quantity of narcotics, As a result, the quantity of

drugs used to establish the statutory mandatory minimum and maximum

penalties was never established by proof beyond a reasonable doubt, as

required.

**E.      Mr. Evans never admitted to specific quantities and the record is devoid of the requisite evidence, proven beyond a reasonable doubt, that allows for the imposition of enhanced penalties.**

14.     As referenced above, Mr. Evans's guilty plea was oral, and was

not supported by a written plea agreement or plea declaration. Dckt. #2085;

---

4 Opinion attached as Exhibit 6.

Exh. 1. At the change of plea hearing, the government recited its factual basis to support Mr. Evans's plea, after which the following exchange took place:

| | |
|---|---|
| The Court: | All right. Have you heard the statement of the assistant United States attorney? |
| Mr. Evans: | Yes. |
| The Court: | Is it true? |
| Mr. Evans: | Most of it is, but some of it ain't. |

Exh.1 at 14:18-25. Mr. Evans went on to state that he was board member of the Blood Disciples, that he took money from a co-defendant and conducted "a drug sale" with another co-defendant, but "Kenyatta Coates and **everything else is a bunch of lies.**" *Id.* at 15:2-4 (emphasis added). The government then attempted to clarify Mr. Evans's statement:

| | |
|---|---|
| Government: | Mr. Evans is admitting that he sold crack cocaine and powder cocaine at the Calumet building and worked in that operation at the Calumet building, I think that more than suffices for the factual basis for his plea. |
| Defense counsel: | That would be sufficient, Judge. |
| The Court: | And do you agree you did all those? Did you sell cocaine and crack from the Calumet building? |
| Mr. Evans: | Well, if I took money from Varney Voker, I guess that means I sold crack cocaine—well, base cocaine, but both. Yes. I didn't sell nothing personally, Judge, but- |
| The Court: | Okay, let me understand what your role was. Tell me what your role was there. I mean, I know you were a board member, but what did you do with respect to |

9

|  | the drugs? |
|---|---|
| Mr. Evans: | I just accepted money every month from Varney Voker. |
| The Court: | And what did Varney Voker do? |
| Government: | He ran the crack selling line at the Calumet building as well as the heroin line. He was also a BD gang member. |
| The Court: | Okay. So why did he give you money? |
| Mr. Evans: | Because I was the board member. |
| The Court: | And was the board—what did the board do with respect to this drug selling? |
| Mr. Evans: | I oversee brothers going – I mean, I oversee brothers incarcerated and make sure they get out. |
| Government: | Your Honor, I think as I stated, and I think Mr. Evans would agree, as a board member, he received a tax for the privilege of these other BD members to sell drugs within his territory and specifically at the Calumet building, and I think he'd also agree that – |
| The Court: | Did you, was that true? |
| Mr. Evans: | Yes. |
| The Court: | And did you know they were selling drugs? |
| Mr. Evans: | Yes. |
| Government: | And also BD board members were selling drugs, and he at times oversaw the operation of the drug line or was present when drug sales were going on and that BD security members were there working security. |

10

| The Court: | Is that true? |
| Mr. Evans: | I wasn't present when drugs was going on, but I oversee the money and taxes. |

Exh. 1 at 15:11 – 17:5.

The government, satisfied that this colloquy was sufficient to establish Mr. Evans's guilt to the conspiracy (Count One), moved on to the charged phone counts (Counts Four and Ten). After Mr. Evans admitted his guilt to one phone count and denied any responsibility for the other (Exh. 1 at 18: "I don't agree with Coates" (the factual basis for Count Ten)), the government agreed to dismiss Count Ten. The Court then asked Mr. Evans for his plea to Counts One and Four, and Mr. Evans said "I'm pleading guilty." Exh. 1 at 18:23.

15. Mr. Evans never admitted to conspiring to distribute or actually distributing any specific quantities of any of the charged drugs, nor did he offer a clear and unequivocal admission of his responsibility for the charged quantities listed in Count One of the superseding indictment. The plea colloquy demonstrates that Mr. Evans did not admit to the government's factual basis ("most of it is [true], but some of it ain't"), nor did he ever provide the Court with an admission that he sold narcotics at the Calumet building (*see, e.g.*, Exh. 1 at 15:11-23; 16:6-14). There is no written, executed document to clarify the scope of Mr. Evans's admission.

11

16.     The lack of such a record is key since, under *Apprendi* and *Alleyne*, the only permissible way that Mr. Evans can be subjected to the enhanced penalties provided by 21 U.S.C. § 841 (including any mandatory minimum penalties), is through proof beyond a reasonable doubt that establishes the threshold quantities required to trigger the application of the more severe sentencing scheme.

**F.     Mr. Evans's guilty plea to the conspiracy count, standing alone, does not provide proof beyond a reasonable doubt of the allegations contained therein.**

17.     While it is indisputable that Mr. Evans pled guilty to Count One of the indictment, which charged him with conspiring to distribute in excess of 50 grams of crack, in excess of 1 kilogram of heroin, in excess of 5 kilograms of cocaine, and an unspecified quantity of marijuana, the facts that were proven beyond a reasonable doubt—in this case the specific facts that were admitted at Mr. Evans's change of plea hearing—fall far short of providing the necessary support to establish an enhanced mandatory minimum penalty in this case. The factual basis fails to establish the necessary quantities to apply a 10 year mandatory minimum sentence or even a 5 year mandatory minimum sentence.

This is, in short, because Mr. Evans's admissions came nowhere near establishing proof beyond a reasonable doubt to support **any** quantity

findings—whether in support of a range of 10 years to life or even a range of 5 to 40 years.

A plea of guilty to the indictment, standing alone, does not establish the factual allegations contained therein. *United States v. Paulette*, 858 F.3d 1055, 1059-61 (7th Cir. 2017)(rejecting government's expansive argument that "a guilty plea amount[s] to an admission of the truth or every detail alleged in the conspiracy count of the indictment," and instead holding that "[a] plea of guilty admits only the essential elements of the offense….Drug type and quantity are not essential elements and need not be proved beyond a reasonable doubt *unless the government is seeking enhanced statutory penalties.*" (emphasis added, citations omitted).)[5] *See also*, *United States v. Hernandez*, Nos. 93-2198, 93-2199, 1994 WL 36803, *6 (7th Cir. Feb. 8, 1994)("[T]he factual allegations contained in the indictment are not established irrefutably simply because the defendant pleaded guilty to the indictment.")[6]

---

5 Despite the Court's holding on this issue, the defendant/appellant's sentence remained unchanged because the defendant/appellant, unlike Mr. Evans, entered into a plea agreement in which he admitted specific quantities sufficient to support the sentence imposed.

6 Opinion attached as Exhibit 7. It is important to note that *Hernandez* was decided before *Apprendi* and, as a result, some of the Court's analysis is no longer good law. For the proposition cited above, however, *Hernandez* remains good law. Though the opinion is unpublished it is included as part of a table listed in the Federal Reporter. 16 F.3d 1226 (7th Circuit 1994).

### G. Absent proof beyond a reasonable doubt of specific quantities, Mr. Evans can only be sentenced for distributing the drug that carries the lower penalty.

18. Without proof beyond a reasonable doubt regarding the quantities of any of the substances referenced at Mr. Evans's change of plea hearing (the conspiracy charged crack, heroin, cocaine, and marijuana and all four substances were referenced at Mr. Evans's change of plea hearing, Exh. 1 at 5:13-21), Mr. Evans's admissions resulted in what is commonly referred to as a general verdict.

> "[T]he punishment imposed cannot exceed the shortest maximum penalty authorized in the statutes criminalizing the multiple objects if the punishment authorized by the conspiracy statute depends on the punishment for the substantive offenses which were the objects of the conspiracy. That is the case here. The maximum sentence for conspiring to distribute a controlled substance depends on the controlled substance to be distributed."

*United States v. Dale*, 178 F.3d 429, 432-33 (6th Cir. 1999).[7]

When the jury returns a general verdict—that is, it finds the defendant guilty beyond a reasonable doubt, but does not make specific quantity findings as to the substances charged in a conspiracy count—"the defendant must be sentenced as if he distributed only the drug carrying the lower penalty." *Id.* at 432.

---

7 *Dale* pre-dates *Apprendi* and the Court's analysis of many sentencing related factors is no longer good law. The opinion remains good authority for the proposition cited above.

19.     In Mr. Evans's case, four substances are charged in the conspiracy count to which he pled guilty—crack, heroin, powder cocaine, and marijuana. Without a jury's verdict finding by proof beyond a reasonable doubt that Mr. Evans is responsible for specific quantities, and without Mr. Evans's admission to the quantities that trigger enhanced statutory penalties, "the shortest maximum penalty applies." In this case, unspecified quantities of crack, heroin, and powder cocaine carry a term of imprisonment of not more than 20 years (with no applicable mandatory minimum). 21 U.S.C. §841(b)(1)(C). For marijuana, which was also charged in the conspiracy count and referenced at Mr. Evans's change of plea hearing, the potential term of imprisonment is "not more than 5 years." 21 U.S.C. §841(b)(1)(D).

20.     Because Mr. Evans's guilty plea did not include specific admissions regarding drug quantities, the record lacks any support for the application of enhanced statutory penalties. As a result, the "shortest maximum penalty" arising out of Mr. Evans's conspiracy conviction provides the penalty. Accordingly, Mr. Evans's sentence of imprisonment cannot exceed 5 years, since that is the maximum punishment that applies to a conviction for distributing an unspecified quantity of marijuana.

21.     Mr. Evans has been in custody for over 15 years. As a result, he respectfully requests that this Court enter an order reducing his sentence to

15

60 months, or time served, in order to effectuate his immediate release.

**H.**     **Conclusion**

WHEREFORE, based on the foregoing Mr. Evans respectfully requests that this Court exercise its power under the First Step Act and reduce his sentence to 60 months or time served. Such a reduction will result in Mr. Evans's immediate release from custody, as he has already served more than 15 years in custody.

Respectfully submitted,

FEDERAL DEFENDER PROGRAM
John Murphy
Executive Director

By:   *s/ Daniel P. McLaughlin*
      Daniel P. McLaughlin
      Counsel for Corey Evans

DANIEL P. McLAUGHLIN
FEDERAL DEFENDER PROGRAM
55 E. Monroe, Suite 2800
Chicago, IL 60603
(312) 621-8350

16

# IN THE
# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| **UNITED STATES** | ) | |
| | ) | **04-CR-464-6** |
| **v.** | ) | |
| | ) | **Judge Elaine Bucklo** |
| **COREY EVANS** | ) | |

## EXHIBITS TO COREY EVANS'S MOTION FOR A REDUCED SENTENCE UNDER SECTION 404 OF THE FIRST STEP ACT

Exhibit 1     Transcript of Mr. Evans's May 18, 2005 change of plea hearing (Docket #2085)

Exhibit 2     Transcript of Mr. Evans's November 17, 2006 sentencing hearing (Docket #1731)

Exhibit 3     *United States v. Allen*, No. 96-CR-149-RNC-3, 2019 WL 1877072 (D. Conn. Apr. 26, 2019)

Exhibit 4     *United States v. Herbert*, 2019 WL 2718498, No. 97-CR-30024, (W.D. Va. Jun. 28, 2019)

Exhibit 5     *United States v. Johnson*, No. 01-CR-543, 2019 WL 2590951 (N.D. Ill. Jun. 24, 2019)(Leinenweber, J.)

Exhibit 6     *United States v. Stone*, No. 96-CR-403, 2019 WL 2475750 (N.D. Ohio Jun. 13, 2019)

Exhibit 7     *United States v. Hernandez*, Nos. 93-2198, 93-2199, 1994 WL 36803 (7th Cir. Feb. 8, 1994)

Exhibit 1          Transcript of Mr. Evans's May 18, 2005 change of plea
                   hearing (Docket #2085)

```
 1                    IN THE UNITED STATES DISTRICT COURT
                        NORTHERN DISTRICT OF ILLINOIS
 2                            EASTERN DIVISION

 3   UNITED STATES OF AMERICA,          )
                      Plaintiff,        )
 4                                      )  No. 04 CR 464-6
             v.                         )  Chicago, Illinois
 5                                      )
     COREY EVANS,                       )  May 18, 2005
 6                                      )  10:30 a.m.
                     Defendant.         )
 7
                  TRANSCRIPT OF PROCEEDINGS - CHANGE OF PLEA
 8
                    BEFORE THE HONORABLE ELAINE E. BUCKLO
 9
     APPEARANCES:
10
     For the Plaintiff:  MR. DANIEL D. RUBINSTEIN
11                       ASSISTANT UNITED STATES ATTORNEY
                         219 South Dearborn Street, 5th floor
12                       Chicago, Illinois 60604
                         (312) 886-4490
13
     For Defendant Corey Evans (6):
14                       MR. J. CLIFFORD GREEN, JR.
                         77 West Wacker Drive, Suite 3200
15                       Chicago, Illinois 60601
                         (312) 424-4002
16

17

18

19

20

21               PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
22                    TRANSCRIPT PREPARED BY COMPUTER

23                          MICHAEL P. SNYDER
                             Official Reporter
24                     United States District Court
                    219 South Dearborn Street, Room 1902
25                       Chicago, Illinois 60604
                         Telephone (312) 435-5563
```

```
 1              THE CLERK:  2004 CR 464, USA versus Corey Evans;
 2   for change of plea.
 3              MR. RUBINSTEIN:  Good morning, Your Honor.  Dan
 4   Rubinstein appearing on behalf of the United States.
 5              MR. GREEN:  Good morning, Judge.  J. Clifford Green
 6   on behalf of Mr. Evans, who is present before you this morning.
 7              THE COURT:  Good morning, Mr. Green.
 8              Good morning, Mr. Evans.
 9              THE DEFENDANT:  Good morning.
10              THE COURT:  It's my understanding we are here for a
11   plea of guilty.
12              MR. GREEN:  A blind plea, yes, ma'am.
13              THE COURT:  All right.  Before I can accept a plea of
14   guilty, I must determine that you are mentally competent to
15   plead at this time, that you've had the assistance of a lawyer,
16   that you understand your trial rights, that you understand the
17   charges against you, that your plea is voluntary, and that
18   there is a basis in fact for your plea.
19              I must put you under oath and ask you questions, and
20   I want you to know that you may talk to your lawyer at any
21   time.  If you lie to me or give false answers to any of my
22   questions, you could be prosecuted for perjury or false
23   statements, a new and separate crime.  In giving truthful
24   answers to some of my questions, you will be giving up your
25   right not to testify against yourself, some of your answers
```

MICHAEL P. SNYDER, Official Reporter

1  will be incriminating, and you will have to admit your guilt.

2  Do you understand what I have told you?

3  THE DEFENDANT:  Yes, ma'am.

4  THE COURT:  All right.  Please swear the defendant.

5  THE CLERK:  Raise your right hand, please.

6  (Defendant sworn.)

7  THE COURT:  Would you please state your name for the

8  record.

9  THE DEFENDANT:  Corey Jamal Evans.

10  THE COURT:  Mr. Evans, how old are you?

11  THE DEFENDANT:  Thirty-one.

12  THE COURT:  Where do you live?

13  THE DEFENDANT:  6217 South Calumet.

14  THE COURT:  Are you married?

15  THE DEFENDANT:  Yes.

16  THE COURT:  How far did you go in school?

17  THE DEFENDANT:  To 11th grade.

18  THE COURT:  What kind of work have you done in the

19  last three years?

20  THE DEFENDANT:  None.

21  THE COURT:  Are you basically in good physical

22  health?

23  THE DEFENDANT:  Yes.

24  THE COURT:  Have you taken any medication or drugs of

25  any kind or alcoholic beverages within the last 24 hours?

MICHAEL P. SNYDER, Official Reporter

4

1          THE DEFENDANT:  No, ma'am.

2          THE COURT:  Have you ever been under the care of a

3   doctor or in a hospital for a mental condition?

4          THE DEFENDANT:  No, ma'am.

5          THE COURT:  Counsel, do either of you have any doubt

6   as to Mr. Evans' competence to plead at this time?

7          MR. GREEN:  I do not, Judge.

8          MR. RUBINSTEIN:  No, Your Honor.

9          THE COURT:  I find that you're competent to offer a

10   plea of guilty.

11          Tell me the name of the attorney who is representing

12   you in this case.

13          THE DEFENDANT:  Mr. Clifford Green.

14          THE COURT:  Have you had enough time to talk to

15   Mr. Green?

16          THE DEFENDANT:  Yes.

17          THE COURT:  Have you told him everything you know

18   about your case?

19          THE DEFENDANT:  Yes.

20          THE COURT:  Are you satisfied with the advice and

21   efforts of your attorney?

22          THE DEFENDANT:  Yes.

23          THE COURT:  I think I'm going to have to have you

24   state the charge because I don't know if he's charged in more

25   than one count.

MICHAEL P. SNYDER, Official Reporter

1            MR. RUBINSTEIN:  He is, Your Honor.  He's charged in

2  Count 1, which is the conspiracy count, and then he's charged

3  with two phone counts, which are Count 4 alleging a phone call,

4  call No. 1539, on March 11th of 2000, and then in Count 10,

5  Your Honor, which charges a second phone count on May 29th of

6  2000, call No. 2504.

7            THE COURT:  That's not really stating the charge.

8            MR. RUBINSTEIN:  Oh, I'm sorry, Your Honor.  Do you

9  want me to state it?

10            THE COURT:  Why don't you state it.

11            Would you listen carefully while he states what the

12  charge is, and I'm going to ask you if you understand that.

13            MR. RUBINSTEIN:  Your Honor, he's been charged in

14  Count 1 with conspiracy to possess with intent to distribute

15  and to distribute in excess of 5 kilograms of mixtures

16  containing cocaine, in excess of 1 kilogram of mixtures

17  containing heroin, and in excess of 50 grams of mixtures

18  containing cocaine base, commonly known as crack cocaine, and

19  marijuana, in violation of Title 21 United States Code section

20  846 and Title 18 United States Code section 2.  That's Count 1,

21  Your Honor.

22            In Count 4, he's been charged with on or about March

23  11th, 2000, at approximately 2:53 p.m. in call No. 1539 on

24  target telephone 1 in the Northern District of Illinois that he

25  did knowingly and intentionally use and cause to be used a

1    communication facility, namely, a telephone, in committing and

2    causing and facilitating the commission of a felony violation

3    of Title 21 United States Code section 846, namely, conspiracy

4    to possess with intent to distribute and to distribute

5    narcotics as charged in Count 1 of the indictment, in violation

6    of Title 21 United States Code section 843(b).

7              He's charged in Count 10 with on or about May 29th,

8    2000, at approximately 6:07 p.m. in call No. 2504 on target

9    telephone No. 3 in the Northern District of Illinois with

10   knowingly and intentionally using and causing to be used a

11   communication facility, namely, a telephone, in committing and

12   causing and facilitating the commission of a felony violation

13   of Title 21 United States Code section 846, namely, conspiracy

14   to posses with intent to distribute and to distribute narcotics

15   as again charged in Count 1 of the indictment, in violation of

16   Title 21 United States Code section 843(b).

17             THE COURT:  Have you discussed the indictment with

18   your attorney?

19             THE DEFENDANT:  Yes.

20             THE COURT:  And have you read it?

21             THE DEFENDANT:  Yes.

22             THE COURT:  Do you understand the charges against

23   you?

24             THE DEFENDANT:  Yes.

25             THE COURT:  Under the Constitution and laws of the

1  United States, you are entitled to trial by jury on the charges

2  against you.  Do you understand this?

3           THE DEFENDANT:  Yes.

4           THE COURT:  Mr. Green, are you appointed or retained?

5           MR. GREEN:  Appointed, Your Honor.

6           THE COURT:  You have counsel here to assist you

7  today, and if you chose to plead not guilty, you would have the

8  right to the assistance of counsel at trial as well.  Your

9  lawyer has been appointed to serve as your counsel if you wish

10 to proceed to trial.  Do you understand this?

11          THE DEFENDANT:  Yes.

12          THE COURT:  Do you understand that you have a right

13 to plead not guilty?

14          THE DEFENDANT:  Yes.

15          THE COURT:  If you plead not guilty, you have a right

16 to a speedy trial, to see and hear all the witnesses called to

17 testify against you, your lawyer would have a right to

18 cross-examine witnesses, and you could use the subpoena of the

19 Court to obtain attendance of witnesses to testify on your

20 behalf.  Do you understand this?

21          THE DEFENDANT:  Yes.

22          THE COURT:  At trial you'd be presumed to be

23 innocent, and the government would be required to prove you

24 guilty by competent evidence beyond a reasonable doubt before

25 you could be found guilty, and you would not have to prove that

1   you were innocent.  Do you understand this?

2            THE DEFENDANT:  Yes.

3            THE COURT:  At trial you'd have the right to testify

4   if you wanted to.  You would also have the right not to

5   testify, and if you chose not to testify, no inference or

6   suggestion of guilt could be drawn from the fact that you did

7   not testify.  Do you understand this?

8            THE DEFENDANT:  Yes.

9            THE COURT:  The trial could be either a jury trial or

10  a trial by a judge without a jury.  A trial by a judge would

11  occur only if you agreed to it.  The government and I would

12  have to agree as well.  Do you understand this?

13           THE DEFENDANT:  Yes.

14           THE COURT:  If the trial were a jury trial, the jury

15  would be composed of 12 persons selected from a large group

16  whose names have been drawn at random from voters' lists.  You

17  and your attorney would have the opportunity to exclude jurors

18  if they were biased against you or disqualified.  You would

19  also be able to exclude a certain number of jurors simply

20  because you did not want them to serve on your jury.  Do you

21  understand this?

22           THE DEFENDANT:  Yes.

23           THE COURT:  If you had a jury trial, the jury would

24  have to agree unanimously and would have to consider each count

25  of the indictment separately.  Do you understand this?

MICHAEL P. SNYDER, Official Reporter

1          THE DEFENDANT:  Yes.

2          THE COURT:  At any trial, a judge or jury would be

3    guided by the rule that requires that guilt be determined

4    beyond a reasonable doubt.  Do you understand that?

5          THE DEFENDANT:  Yes.

6          THE COURT:  Do you understand that if at a trial you

7    were found guilty, you would have a right to appeal?

8          THE DEFENDANT:  Yes.

9          THE COURT:  Do you understand that if you plead

10   guilty, you waive, that is, you give up all of these trial

11   rights?

12         THE DEFENDANT:  Yes.

13         THE COURT:  If you plead guilty and I accept your

14   plea, there will be no trial, and I will enter a finding of

15   guilty on the basis of your plea and sentence you after a

16   sentencing hearing.  Do you understand this?

17         THE DEFENDANT:  Yes.

18         THE COURT:  You'll have to tell me what the penalty

19   is.

20         MR. RUBINSTEIN:  Yes, Your Honor.  On Count 1, the

21   first count, the mandatory minimum penalty is 10 years

22   imprisonment with a maximum penalty of life imprisonment, a

23   maximum fine of $4 million, and a term of supervised release to

24   follow any term of imprisonment of not less than five years and

25   up to any number of years including life, which the Court may

1   specify.

2          As to Counts 4 and 10, the punishment is up to five

3   years in prison, a fine of up to $250,000, a term of supervised

4   release to follow any term of imprisonment of up to three

5   years, and on all counts there will be a mandatory $100 special

6   assessment.

7          THE COURT:  Do you understand all that?

8          THE DEFENDANT:  Yes, ma'am.

9          THE COURT:  Has anyone forced you in any way to plead

10  guilty?

11         THE DEFENDANT:  No, ma'am.

12         THE COURT:  Has anyone threatened you in any way to

13  cause you to plead guilty?

14         THE DEFENDANT:  No.

15         THE COURT:  Have any promises been made to cause you

16  to plead guilty?

17         THE DEFENDANT:  No, ma'am.

18         MR. RUBINSTEIN:  Your Honor, there is one promise I

19  should put on the record.  The government has agreed, even

20  though there's not a written plea agreement, to give this

21  defendant the third point for accepting responsibility timely

22  pursuant to United States sentencing guideline section 3E1.1.

23  I don't believe there's an 851 filed against this defendant,

24  but if there were, the government would also move to dismiss

25  that at the time of sentencing.


                MICHAEL P. SNYDER, Official Reporter

```
 1          MR. GREEN:  That's correct, Judge.

 2          MR. RUBINSTEIN:  So those two promises have been made

 3  to his lawyer and the defendant and are now part of the record.

 4          THE COURT:  Do you understand that?

 5          THE DEFENDANT:  Yes.

 6          THE COURT:  Have any other promises been made?

 7          THE DEFENDANT:  Not to my knowledge.

 8          MR. GREEN:  There have been no other promises, Judge.

 9          THE COURT:  All right.  Is your decision to plead

10  guilty entirely voluntary?

11          THE DEFENDANT:  Yes.

12          THE COURT:  Do you understand that I have the final

13  decision as to what your sentence will be?

14          THE DEFENDANT:  Yes.

15          THE COURT:  Will the government please summarize what

16  its evidence would be if this case were tried.

17          MR. RUBINSTEIN:  Yes, Your Honor.  If this case went

18  to trial, the government would prove beyond a reasonable doubt

19  that beginning in 1989 and continuing through May of 2004, the

20  defendant conspired with members of the Black Disciple street

21  gang, the BDs, and others in Chicago, Illinois, and elsewhere

22  to knowingly and intentionally distribute and possess with

23  intent to distribute in excess of 5 kilograms of cocaine, in

24  excess of 50 grams of cocaine base in the form of crack

25  cocaine, in excess of 1 kilogram of heroin, and marijuana.
```

1        The defendant rose through the ranks of the BDs to

2  the high ranking position of board member.  The BDs had a

3  hierarchical power structure as follows:

4        At the top of the power structure was the king, who

5  was the leader of the BDs.  Co-defendant Marvel Thompson was

6  the king of the BDs for the majority of the time charged in the

7  conspiracy.  Most recently in approximately 2003 the BDs

8  changed the power structure of the gang to have a leadership

9  structure.  Co-defendant Marvel Thompson was the king of the

10  south side of Chicago, co-defendant Donnell Jehan was the king

11  of the east side of Chicago including the gang's headquarters

12  at the public housing apartment building located at 6217 South

13  Calumet Avenue in Chicago, known as the Calumet building, and

14  co-defendant Albert Span was the king of the BDs for the west

15  side of Chicago.

16        Next in line of authority below the kings were board

17  members who were appointed by the king.  Board members oversaw

18  the distribution of drugs and acts as a representative of the

19  king in the particular area of BD controlled territory.

20        The next tier below board members consisted of

21  ministers and co-ministers who delivered orders to BD members

22  residing in or selling drugs in the respective territory.

23        Next in rank is co-minister followed in descending

24  order of responsibility and authority by director, sometimes

25  called the Demetrius or First D, co-director, sometimes called

1 Second D, chief of security, and members or soldiers.

2          During the course of the charged conspiracy, the

3 defendant obtained -- strike that.

4          During the course of the charged conspiracy,

5 defendant as a member of the BDs personally sold retail and

6 wholesale amounts of crack cocaine as well as powder cocaine to

7 other BDs and other individuals in the area of the south and

8 east sides of Chicago and particularly in or around the Calumet

9 building.  Some of the defendant's sources of supply of cocaine

10 and crack cocaine were co-defendants Kenyatta Coates and Mark

11 Hall.

12          While a board member, the defendant -- while a board

13 member and while he held other ranking positions in the BDs,

14 the defendant participated in the crack cocaine, cocaine, and

15 heroin selling operations carried out by BD members in the

16 Calumet building which was overseen by co-defendant Donnell

17 Jehan.

18          During the course of the conspiracy, the BDs also

19 employed security workers who alerted BD drug sellers to police

20 presence or attempts by rival drug members to rob or assault

21 drug workers.

22          In addition, while defendant was a board member, some

23 BD members, including co-defendant Varney Voker, paid defendant

24 a quote tax for the privilege of running crack cocaine and

25 heroin selling operations in the Calumet building.

1          The defendant further admits that the BDs had laws

2   and rules that its members were required to memorize and obey.

3   Two of the principal laws were the BD laws of aid and

4   assistance and the code of silence.

5          Aid and assistance stated that all BD members must

6   assist any other member when called upon for any purpose.

7          The code of silence stated that no member of the gang

8   was permitted to discuss gang business or activities with

9   nongang members.

10         The punishment meted out for violations of BD rules

11   ranged from financial fines to severe physical beatings, being

12   shot, up to and including murder.  If a gang member broke the

13   quote code of silence rule by cooperating with law enforcement

14   authorities, the punishment was death.  During the course of

15   the conspiracy the defendant admits that he ordered and at

16   times carried out BD violations.

17         MR. GREEN:  So stipulated, Judge.

18         THE COURT:  All right.  Have you heard the statement

19   of the assistant United States attorney?

20         THE DEFENDANT:  Yes.

21         THE COURT:  Is it true?

22         THE DEFENDANT:  Most of it is, but some of it ain't.

23         THE COURT:  All right.  Tell me in general what it is

24   that you did, and then tell me what isn't accurate.

25         THE DEFENDANT:  Well, I was the board member.

MICHAEL P. SNYDER, Official Reporter

1          THE COURT:  Of this gang?

2          THE DEFENDANT:  Yes, and I did accept money from

3   Varney Voker, and I did do a drug sale with Mark Hall.  But

4   Kenyatta Coates and everything else is a bunch of lies.

5          THE COURT:  What is this?

6          MR. RUBINSTEIN:  Well, Your Honor, Count 10 of the

7   indictment refers to a call which Kenyatta Coates and Mr. Evans

8   participated in, and that's the basis for that.  But I don't

9   think it's salient to the factual basis, so if we are going to

10  amend the factual basis to delete the reference to Kenyatta

11  Coates and Mr. Evans is admitting that he engaged in, obtained

12  drugs from Mark Hall as a source of supply and he's also

13  admitting that he sold crack cocaine and powder cocaine at the

14  Calumet building and worked in that operation at the Calumet

15  building, I think that more than suffices for the factual basis

16  for his plea.

17         MR. GREEN:  That would be sufficient, Judge.

18         THE COURT:  And do you agree you did all those?  Did

19  you sell cocaine and crack from the Calumet building?

20         THE DEFENDANT:  Well, if I took money from Varney

21  Voker, I guess that means I sold crack cocaine -- well, base

22  cocaine, but both.  Yes.  I didn't sell nothing personally,

23  Judge, but --

24         THE COURT:  Okay.  Let me understand what your role

25  was.  Tell me what your role was there.  I mean, I know you

MICHAEL P. SNYDER, Official Reporter

1    were a board member, but what did you do with respect to the

2    drugs?

3              THE DEFENDANT:  I just accepted money every month

4    from Varney Voker.

5              THE COURT:  And what did Varney Voker do?

6              MR. RUBINSTEIN:  He ran the crack selling line at the

7    Calumet building as well as the heroin line.  He was also a BD

8    gang member.

9              THE COURT:  Okay. So why did he give you money?

10             THE DEFENDANT:  Because I was the board member.

11             THE COURT:  And was the board -- what did the board

12   do with respect to this drug selling?

13             THE DEFENDANT:  I oversee brothers going -- I mean, I

14   oversee brothers incarcerated and make sure they get out.

15             MR. RUBINSTEIN:  Your Honor, I think as I stated, and

16   I think Mr. Evans would agree, as a board member, he received a

17   tax for the privilege of these other BD members to sell drugs

18   within his territory and specifically at the Calumet building,

19   and I think he'd also agree that --

20             THE COURT:  Did you, was that true?

21             THE DEFENDANT:  Yes.

22             THE COURT:  And did you know they were selling drugs?

23             THE DEFENDANT:  Yes.

24             MR. RUBINSTEIN:  And also BD members were selling

25   drugs, and he at times oversaw the operation of the drug line

1   or was present when drug sales were going on and that BD

2   security members were there working security.

3            THE COURT:  Is that true?

4            THE DEFENDANT:  I wasn't present when drugs was going

5   on, but I oversee the money and taxes.

6            THE COURT:  I think that's sufficient.

7            MR. RUBINSTEIN:  I do too, Your Honor.

8            THE COURT:  Well, since you acknowledge that you are

9   in fact guilty as charged in Count 1, 4, and 10?

10           MR. RUBINSTEIN:  Yes, Your Honor.

11           THE COURT:  Of the indictment, and you have had the

12   assistance of counsel, and you know your right to --

13           Wait a minute.  I forgot to ask how you pled.

14           MR. RUBINSTEIN:  Your Honor, I also forgot to read in

15   the factual basis for Count 4 and 10.

16           THE COURT:  Okay.  Let's go back.

17           MR. RUBINSTEIN:  Sorry.  I'm just going to read from

18   the indictment, which is on or about March 11, 2000, at

19   approximately 2:53 p.m., the defendant engaged in a phone call

20   that was intercepted pursuant to a wiretap order for the

21   purpose of causing and facilitating the commission of a felony,

22   namely, the ongoing BD drug trafficking conspiracy; and,

23   second, Count 10, on May 29th, 2000, at approximately 6:07

24   p.m., call No. 2504 on target phone 3, defendant and Kenyatta

25   Coates knowingly and intentionally -- strike that -- they

MICHAEL P. SNYDER, Official Reporter

1  participated in a phone call for the purpose of facilitating

2  and furthering the ongoing drug trafficking conspiracy.

3          THE COURT:  And do you agree with both of those

4  statements?

5          THE DEFENDANT:  I don't agree with the Coates.

6          THE COURT:  That would be Count 10.  What's the issue

7  here?

8          MR. RUBINSTEIN:  I don't think there's an issue, Your

9  Honor.

10          Just give me one second, Your Honor.

11      (Pause.)

12          MR. RUBINSTEIN:  Why don't we do this.

13          One other promise then we'll do, Your Honor.  We'll

14  make the defendant's plea to Counts 1 and 4, since he's

15  disputing Count 10, and the government will move to dismiss

16  Count 10 at the time of sentencing.

17          THE COURT:  Okay.  That might be best.

18          Would you agree with what the government said about

19  Count 4?

20          THE DEFENDANT:  Yes, ma'am.

21          THE COURT:  Okay.  Then what is your plea to Counts 1

22  and 4 of the superseding indictment?

23          THE DEFENDANT:  I'm pleading guilty.

24          THE COURT:  All right.  Since you acknowledge that

25  you are guilty as charged in Counts 1 and 4 of the superseding

MICHAEL P. SNYDER, Official Reporter

1  indictment, and you've had the assistance of counsel, and you

2  know your right to a trial and the maximum possible punishment,

3  and you are voluntarily pleading guilty, I will accept your

4  plea of guilty and enter a judgment of guilty on your plea.

5         I will order a presentence investigation.  Your

6  attorney will explain that process.

7         Mathew, give them some dates.

8         THE CLERK:  Sentencing set for August 5 at 10:30

9  a.m., and any objection to the PSI report and motion to be

10  filed by July 27, and response August 1st.

11         MR. GREEN:  Judge, I have another sentencing on July

12  5th at 10:30.

13         THE CLERK:  Do you want to make it 1:30?

14         MR. GREEN:  1:30 is fine.

15         THE COURT:  All right, thank you.

16         MR. GREEN:  Thank you, Your Honor.

17         MR. RUBINSTEIN:  Thank you, Your Honor.

18   (End of proceedings.)

19             C E R T I F I C A T E

20     I, Michael P. Snyder, do hereby certify that the
forgoing is a complete true, and accurate transcript of the
21  proceedings had in the above-entitled case before the Honorable
ELAINE E. BUCKLO, one of the judges of said Court, at Chicago,
22  Illinois, on May 18, 2005.

23                   _____
                   Official Court Reporter
24                   United States District Court
                   Northern District of Illinois
25

MICHAEL P. SNYDER, Official Reporter

Exhibit 2        Transcript of Mr. Evans's November 17, 2006 sentencing hearing (Docket #1731)

1

# CLERK'S FILE COPY

1    IN THE UNITED STATES DISTRICT COURT
     NORTHERN DISTRICT OF ILLINOIS
2           EASTERN DIVISION

3  UNITED STATES OF AMERICA,              )
                Plaintiff,               )
4                                        )   No. 04 CR 464 -6
         v.      06-4171                  )   Chicago, Illinois
5                                        )
   COREY EVANS                            )   November 17, 2006
6             Defendant.                 )   2:30 p.m.

7       TRANSCRIPT OF PROCEEDINGS - DISPOSITION

8       BEFORE THE HONORABLE ELAINE E. BUCKLO

9  APPEARANCES:

10 For the Plaintiff:   MR. JOSEPH M. ALESIA
                        MR. DANIEL D. RUBINSTEIN
11                      ASSISTANT UNITED STATES ATTORNEY
                        219 South Dearborn Street, 5th floor
12                      Chicago, Illinois 60604
                        (312) 353-6630
13                           469-6165

14 For Defendant Corey Evans (6):
                        MR. JAMES A. McGURK
15                      STACK & FILPI
                        140 South Dearborn Street, Suite 411
16                      Chicago, Illinois 60603
17                      U.S.CA 21 7th Circuit      FILED

18                      FILED

                        MAR 0 9 2007  DW        MAR 0 6 2007
19
                        GINO J. AGNELLO         MICHAEL W. DOBBINS
20                      CLERK                   CLERK, U.S. DISTRICT COURT.
                        DOC.#_____
21

22      PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY
        TRANSCRIPT PREPARED BY COMPUTER            DOCKETED
23                                                  MAR 0 8 2007
        MICHAEL P. SNYDER
24         Official Reporter
        United States District Court
25  219 South Dearborn Street, Room 1902
        Chicago, Illinois 60604
        Telephone (312) 435-5563

CLERK'S FI .E COPY

1731

1        THE CLERK:  2004 CR 464, USA versus Corey Evans; for

2  sentencing.

3        MR. ALESIA:  Good morning, Judge.  Joe Alesia and Dan

4  Rubinstein on behalf of the United States.

5        MR. RUBINSTEIN:  Good afternoon, Your Honor.

6        MR. McGURK:  Good afternoon, Your Honor.  James

7  McGurk on behalf of the defendant Corey Evans, who is present.

8        THE COURT:  Good afternoon.

9        All right.  We are here for sentencing?

10        MR. McGURK:  Yes, Your Honor.

11        THE COURT:  Do we have any issues left open?

12        MR. ALESIA:  Judge, I believe, at least in the

13  government's view, the only issues, the only issue left is drug

14  quantity.  After reviewing all of our submissions and reviewing

15  the plea colloquy, it looks like Mr. -- and also in the

16  statements in the PSR, it looks like Mr. Evans has conceded

17  both role in the offense and the gun enhancement, unless

18  counsel wants to correct me.

19        The government, first of all, has no changes or

20  deletions to the PSR.

21        THE COURT:  Okay.

22        MR. McGURK:  As to the issue of Mr. Evans' plea

23  colloquy, Your Honor, Mr. Evans did in fact admit his

24  leadership role, and we will not contest that.

25        THE COURT:  Yes.

1          MR. McGURK:  The issue as to the gun enhancement, I

2    think, Your Honor, there is a dispute.  We are not agreeing

3    with that.  We certainly disagree both with the issue of the

4    gun enhancement as well as, and most particularly, most

5    importantly with the drug quantity issue, and that's, that is

6    the principal issue I believe that divides the parties at this

7    point.  That drives the sentence issue calculation.

8          THE COURT:  What is your argument about the gun?

9    Because, I mean, I certainly -- at the trial and, you know,

10   gee, if I just go by the trial testimony at Mr. White's trial,

11   it's hard for me to imagine at this point how anybody who was a

12   leader could argue that the gun enhancement is not proper.  So

13   tell me what your argument is.

14         MR. McGURK:  The argument, Your Honor, is I think a

15   simple one.  Mr. Evans pleaded guilty to Count 1 and Count 4.

16   His plea, which the transcript the Court has, he stated his

17   role as a board member.  He did not at that point indicate that

18   he had any role in terms of any firearms violation, any other

19   issue.

20         So if the Court is saying because of quote unquote

21   his position as admitted, with no other evidence, that

22   certainly no other evidence that he or his counsel had the

23   opportunity of examining --

24         THE COURT:  No, but I'm just saying prima facie, it

25   seems to me difficult, if you've got evidence that you are

Culloton - direct by Alesia

1  putting on to counteract the evidence at trial that guns were
2  found in various buildings, that a gun was used, of course, in
3  the White shooting, of which he was found guilty, that guns --
4  there was lots of testimony about guns being used as to enhance
5  and control the drug operation.  But I'll let the government be
6  more specific.
7          MR. ALESIA:  Judge, that's fine.  If you want, Judge,
8  the government does have one very brief witness to present some
9  evidence, and then we would get into argument on both the
10 remaining issues.
11         THE COURT:  All right.
12         MR. ALESIA:  Thank you, Judge.
13         MR. McGURK:  Thank you.
14         MR. ALESIA:  Judge, the government would call Special
15 Agent Culloton.
16         THE COURT:  Okay.
17         MICHAEL CULLOTON, PLAINTIFF'S WITNESS, SWORN
18         THE COURT:  Please be seated.
19                    DIRECT EXAMINATION
20 BY MR. ALESIA:
21 Q.  Good afternoon, Agent.  Could you please state your name
22 and spell your first and last name for the court reporter.
23 A.  Special Agent Michael J. Culloton C-u-l-l-o-t-o-n.
24 Q.  Sir, by whom are you employed?
25 A.  Federal Bureau of Investigation.

Culloton - direct by Alesia

1  Q.  Are you a special agent?

2  A.  Yes.

3  Q.  How long have you been so employed?

4  A.  Approximately ten years.

5  Q.  What squad of the FBI here in Chicago are you currently

6  assigned to?

7  A.  Currently assigned to the West Suburban Task Force on

8  Gangs.

9  Q.  Prior to your time in the West Suburban Task Force on

10  Gangs, where were you assigned?

11  A.  I was assigned to the Chicago Joint Gang Task Force.

12  Q.  And during your time as a member of the Chicago joint Gang

13  Task Force, did you serve for a period of time as the case

14  agent regarding an investigation of the Black Disciples street

15  gang members?

16  A.  Yes, I did.

17  Q.  During the course of your term as a case agent, did you

18  come to know several of the targets of that investigation?

19  A.  Yes.

20  Q.  Was one of those individuals a person named Corey Evans?

21  A.  Yes.

22  Q.  During the course of your investigation, did you meet with,

23  at any point see and meet with Mr. Evans?

24  A.  Yes, I did.

25  Q.  Do you see him in court today?

MICHAEL P. SNYDER, Official Reporter

Culloton - direct by Alesia

1   A.   Yes, I do.

2   Q.   Could you please tell us where he is seated and what he's

3   wearing.

4   A.   He's seated at the defense counsel in the orange.

5        MR. ALESIA:   Indicating for the record, Judge, the

6   defendant, Mr. Evans?

7        THE COURT:   Yes.

8   BY MR. ALESIA:

9   Q.   During the course of your investigation, Agent, did you

10  work with officers and members of the Chicago Police

11  Department?

12  A.   Yes, I did.

13  Q.   And did you have an opportunity to review reports and

14  documents generated both by FBI agents and Chicago police

15  officers during the time you served on the investigation as

16  well as in the years preceding that?

17  A.   Yes.

18  Q.   Specifically, based on your investigation, did you learn

19  that on or about March 31st, 1993, at approximately 1:55 p.m.,

20  Mr. Evans was arrested by members of the Chicago Police

21  Department?

22  A.   Yes, he was.

23  Q.   Where did that take place?

24  A.   At 6217 South Calumet.

25  Q.   During the course of your investigation, did you learn

Culloton - direct by Alesia

1 whether or not the Black Disciple members had a name for that

2 building?

3 A.   They called it the Calumet building.

4 Q.   And by the way, during your investigation, did you learn

5 that Mr., whether or not Mr. Evans had a role within that gang

6 within the conspiracy?

7 A.   Yes.

8 Q.   What was that?

9 A.   He was a board member.

10 Q.   For what area?

11 A.   For the Calumet building and the area surrounding it.

12 Q.   And what did your investigation show Mr. Evans was arrested

13 for on March 31st of 1993 at that time?

14 A.   He was arrested for mob action because he was stopping

15 tenants and visitors to the building, asking them why they were

16 there, searching them.

17 Q.   Was anybody else arrested for engaging in similar conduct

18 at that time?

19 A.   Yes, there was two other people arrested, James Stewart

20 being one of the other arrestees.

21 Q.   Was James Stewart also a target of your investigation?

22 A.   Yes.

23 Q.   Sir, on December 4th of 2001, did members of the

24 investigative team execute about 47, or 46 search warrants at

25 the Calumet building?

Culloton - cross by McGurk

1   A.   Yes.

2   Q.   And to your knowledge, was Mr. Evans found in one of the

3   apartments at that building during that search?

4   A.   Yes, he was.

5   Q.   And again, on May 12th of 2004, was the defendant Mr. Evans

6   arrested?

7   A.   Yes, he was.

8   Q.   Regarding this case?

9   A.   Yes.

10  Q.   Where was he arrested at?

11  A.   At the Calumet building, 6217.

12          MR. ALESIA:   Nothing further, Judge.   Tender the

13  witness.

14          THE COURT:   Okay.

15                      CROSS-EXAMINATION

16  BY MR. McGURK:

17  Q.   Special Agent Culloton, my name is James McGurk.   I

18  represent Mr. Evans in this proceeding.

19          Have we ever met before?

20  A.   No.

21  Q.   Special Agent, what was the date of the arrest for mob

22  action, as best you recall?

23  A.   I don't recall offhand.

24  Q.   Would it be correct to say it was in 1994, approximately?

25  A.   Yes, if that's what the report reads, yes.

Culloton - cross by McGurk

1  Q.  Are you suggesting that in 1994 Mr. Evans was a board
2  member of the Black Disciples?
3  A.  You know, exactly at that time if he was a board member, I,
4  I could not speak to that.  I know at one point he was a board
5  member in the gang and he held different ranks along, based on,
6  you know, information I was given by cooperating witnesses and
7  others I've interviewed.
8  Q.  In terms of the arrest, you said that Mr. Evans was
9  arrested on May 12th, 2004?
10  A.  Yes.
11  Q.  Were you part of that arrest group?
12  A.  I was part of the arrest.  I was the case agent that day.
13  I was not at the location where he was arrested.
14  Q.  Did you take a statement from Mr. Evans?
15  A.  Not on that date.
16  Q.  On December 4th, 2001, the execution of the search warrants
17  at the Calumet building, did you take a statement from
18  Mr. Evans at that point?
19  A.  I did not take a statement from him.
20  Q.  And then you indicated that you had met Mr. Evans during
21  the course of your investigation?
22  A.  Yes.
23  Q.  Did you ever take a statement from Mr. Evans?
24  A.  Yes.
25  Q.  And during that statement, did Mr. Evans acknowledge that

MICHAEL P. SNYDER, Official Reporter

Culloton - cross by McGurk

1   he was, that he had firearms?

2   A.   I do not recall.

3   Q.   And during that statement, did he acknowledge dealing in

4   substantial quantities of heroin or of cocaine?

5   A.   Yes.

6   Q.   A kilo quantity?

7   A.   I'm not sure of the amounts without referring back to the

8   interview notes, but based on my knowledge of the

9   investigation, yes.

10  Q.   In terms of the confidential informants that you're

11  referring to, are those individuals who testified at trial?

12  A.   There are some confidential informants that did not testify

13  at trial.

14  Q.   Some confidential informants did not testify at trial, and

15  some subsequently did?

16  A.   Yes.

17  Q.   The trial we are referring to is the trial of Mr. White?

18  A.   That is correct.

19  Q.   Now, it is -- you are aware that Mr. Evans in fact entered

20  a plea of guilty himself?

21  A.   Yes.

22  Q.   And did not go to trial?

23  A.   That's correct.

24  Q.   And Mr. Evans did not testify at that trial and was not

25  represented?

11

1   A.  No.

2           MR. McGURK:  I have no further questions of this

3   witness.  Thank you, Your Honor.

4           THE COURT:  All right.

5           MR. ALESIA:  Nothing else, Judge.  Thank you.

6           THE COURT:  All right, you're excused.

7       (Witness excused.)

8           MR. ALESIA:  Judge, regarding -- that's all the

9   evidence.

10          Actually, there is one more exhibit the government

11  would offer.  It was offered as Government Exhibit Document 32

12  during the trial of Mr. White, and I'll tender a copy to Your

13  Honor, which I will argue off of regarding drug quantity as

14  well as the drug offense.

15          THE COURT:  All right.

16          MR. ALESIA:  First, Judge, I'll start with the gun

17  enhancement, which is were these guns foreseeable, were they

18  possessed by Mr. Evans, and if not possessed directly by him,

19  during and in furtherance of the conspiracy, was it foreseeable

20  to him that others that he was responsible for would possess

21  and use these guns?  And absolutely, Judge, the answer is yes.

22          Obviously, you heard the testimony of Mr. Hall and

23  Mr. Voker during the trial who talked about the various levels

24  of security at the Calumet building, and that's the building

25  that the defendant controlled.  For several years you heard the

1   testimony of Mr. Voker and you've seen in the grand jury

2   testimony transcripts of individuals like Mr. Coates,

3   Mr. Varmah Voker, the defendant's own cousin, Milton Evans,

4   which I'm going to talk extensively about today, as well as

5   other individuals, Black Disciple members named Paris O'Bryant

6   and others.

7          And they talked about different levels of security,

8   how some security workers would actually pat down people

9   entering the building to make sure they weren't working for the

10  police or wearing recording devices to try and stop them, just

11  like Mr. Evans himself was doing back in 1993 as you heard from

12  Agent Culloton just recently.  Then you have the security

13  workers who would stand next to or near the drug dealers who

14  were actually armed in case the drugs and the money was trying

15  to be stolen by rival members or just thieves.

16          MR. McGURK:  Your Honor, I don't want to interrupt

17  counsel's argument, but I believe he stated that the defendant

18  was arrested for patting down people as they entered the

19  building.  I don't see that as part of the arrest report, and I

20  believe counsel is overstating the nature of the 1994 arrest.

21          MR. ALESIA:  I believe the testimony, Judge, was that

22  he was asking people, inquiring why they were coming in.  If I

23  misspoke about patting down, I apologize.

24          THE COURT:  All right.

25          MR. ALESIA:  But you did hear other testimony about

MICHAEL P. SNYDER, Official Reporter

1   even -- and that's why Mr. White shot Officer Hughes, because

2   he was one of those people, while albeit at a different

3   building, a similar type CHA high-rise that the BDs controlled,

4   patting people down as they entered the building if they were

5   suspicious.

6           And I'd like to specifically point, Judge, to Milton

7   Evans' testimony, his grand jury testimony beginning at page

8   22.  When the defendant, Mr. Evans, Milton Evans, who is the

9   defendant's cousin, testified under oath back on April 29th of

10  2003 that C-Mac, which was the defendant's nickname, Corey

11  Evans' nickname, kept guns in apartment 1007 for the workers to

12  use, and other BDs had guns throughout the Calumet building in

13  various apartment.

14          And you now know, Judge, from other sentencing

15  hearings, the trial, and government's Document 32 that

16  apartment 1007 was important, was a key apartment for Mr. Evans

17  and Mr. Stewart.  Mr. Hall told you that that was the location

18  that drugs were going into and being repackaged and sent out.

19  It was borne out by the fact that on that December 1st first

20  search warrant of the Calumet building, hundreds of -- all the

21  drug paraphernalia and the processing equipment was there,

22  boxes of Dorman used to cut drugs, drug processing

23  paraphernalia and numerous small empty bags.

24          And Mr. Milton Evans also told you, Judge, that some

25  of the guns that C-Mac had to have control over included a .357

1   and .380 caliber revolvers, Glock 9 millimeter pistols and

2   revolvers, as well as SKS assault rifles.  And he testified

3   that sometimes that the BDs were at war with the rival Gangster

4   Disciples, there would be BDs stationed on the roof of the

5   Calumet building with the SKS rifles in order to shoot at the

6   GDs.  The BDs also used big green garbage dumpsters to block

7   the street and the alley behind the Calumet building in order

8   to stop the police from driving up behind the entrance to the

9   building.

10          He also told you about people being patted down by

11  security workers on the first floor.  The searches were done to

12  try and see if people coming into the building were police

13  informants wearing wires or stick-up men coming to rob the

14  spot.

15          Moreover, Judge, if you look at Mr. Milton Evans'

16  testimony on page 30 of that transcript, he tells an incident

17  about November 10th, 1999, when he told the grand jurors under

18  oath that he was working for C-Mac's crack spot selling crack

19  and C-Mac was downstairs at the entrance of the Calumet

20  building when Mr. Milton Evans saw C-Mac with the .357

21  revolver.  Prior to that date C-Mac had showed Milton Evans

22  that gun and told him not to get caught with it because it was

23  stolen.

24          And then in the afternoon hours security workers gave

25  the heads-up call, and you know the heads-up call meant that,

1   hey, there's police in the area.  It's a call to the drug

2   dealers to run upstairs and hide so you don't get caught.

3          Milton Evans said he saw plainclothes police officers

4   pull up to the front entrance in an unmarked car.  At that time

5   C-Mac gave him the .357 revolver and told him to hold it.

6   Milton Evans ran up the set of stairs, and as he ran up to the

7   sixth floor, he hid the gun and a pack of crack cocaine he was

8   selling for C-Mac in a garbage bag.  Unfortunately for

9   Mr. Milton Evans, the police officers chased him, found the gun

10  and 43 bags of crack, and arrested him.  He actually pled

11  guilty to that case and was sentenced to boot camp in state

12  court.

13         Following the serving of his sentence, in January of

14  2001 he testified in the grand jury that upon coming out, the

15  defendant Corey Evans told him get out of town and if you come

16  back to Chicago, I'm going to have the BDs kill you, because

17  C-Mac thought that Milton Evans was talking to and helping the

18  police, which at that time Milton Evans was not doing.  So they

19  put him on a bus and sent him up to Minnesota.

20         Judge, that evidence alone shows you that Mr. Corey

21  Evans is responsible and had a direct role and knowledge of the

22  guns being used in this case.

23         You also look at, in our government's submission,

24  Judge, the evidence, and I'll just point you to some other

25  places.  Testimony of Paris O'Bryant, Milton Evans as I told

1  you about, Mark Hall, Paris O'Bryant on several occasions.  And

2  I'll get into more later on arguments about the violations, but

3  just to limit it right now to drugs and to guns, Judge, I'll

4  talk about that, and then also go back to the December 4th,

5  2001 search warrant where, as a result of the searches of all

6  those apartments, I'll try and summarize here, in apartment 707

7  there was a night vision scope recovered, in apartment 1108

8  there was a .380 semiautomatic caliber pistol with seven

9  bullets, apartment 1212 .40 caliber semiautomatic pistol with a

10  defaced serial number, boxes of ammunition for .25 caliber

11  rounds, .223 caliber rounds and 7.62 millimeter rounds.

12  Apartment 1504, three boxes of shotgun shells and assorted drug

13  paraphernalia.

14        Judge, those are just a couple incidents and examples

15  during the many years of Mr. Evans' reign at the Calumet

16  building where guns were involved in this offense, were

17  foreseeable to him, and were actually possessed by him in

18  furtherance of the conspiracy, which is why, Judge, the

19  government believes that the two-level enhancement is

20  applicable to Mr. Evans.

21        THE COURT:  All right.  Well, I have read, reviewed

22  all the testimony and read all the grand jury testimony that

23  everybody had been apprised was going to be considered in this

24  hearing.  Go ahead.

25        MR. McGURK:  May I respond, Your Honor?

1       THE COURT:  Yes.

2       MR. McGURK:  Can I have a brief moment with

3  government counsel?

4     (Pause.)

5       MR. McGURK:  Your Honor, I have a memorandum which

6  essentially simply articulates the same things that I'm saying,

7  but I'd just like to have one in the record.  It is

8  supplemental to the memorandum that was filed by Mr. Evans'

9  original defense counsel in July of 2005.

10       THE COURT:  And you're just giving this to me now?

11       MR. McGURK:  I am, Your Honor, but it simply sets

12  forth the arguments that I'm saying.  I simply want to have a

13  written record of that.

14       THE COURT:  All right.

15       MR. McGURK:  I'm providing that to counsel.

16       THE COURT:  There is a written record because there's

17  a court reporter here.

18       MR. McGURK:  Yes, Your Honor.  I understand.

19       The points that I would simply raise at this point is

20  counsel has gone on at great length about the findings of

21  weapons in various apartments.  Well, the Court certainly can

22  take judicial notice that lots of people lived in the Calumet

23  building.  The government seems to suggest that any weapon

24  found in the Calumet building has to be attributable to my

25  client.

1          The most important point that I would make, Your

2   Honor, is that all of the evidence that the government is

3   talking about, the evidence from the trial, the grand jury

4   evidence; is evidence that Mr. Evans never had the opportunity

5   to confront at trial.

6          THE COURT:  But that's absolutely not true.  He could

7   bring in any of these people.  Other people have.  He's chosen

8   not to bring anybody in and examine them.

9          MR. McGURK:  Well, among the things that the

10  government is relying upon is the fact that we certainly don't

11  have the opportunity to, and Mr. Evans, of course, did not have

12  the opportunity to be present in the grand jury.  We have the

13  transcripts of testimony.  The issue of --

14         THE COURT:  But you could have brought any of those

15  people, called for any of those people to be brought in here

16  and, to the extent they used grand jury testimony,

17  cross-examine them about it or --

18         MR. McGURK:  Well, the remaining issue, Your Honor, I

19  think is the question of whether an admitted role of leadership

20  means that Mr. Evans by that mere statement has to be

21  responsible for firearms.

22         I would suggest that it stretches the Court's and the

23  due process requirements of my client to suggest that a 1994

24  arrest somehow relates to today's sentencing in November of

25  2006 relating to the issue of whether there were, there were

1    weapons that he individually is responsible for.  And, of

2    course, the issue before this Court is the gun enhancement and

3    the issue of the drug quantity.  And as to the gun enhancement,

4    Your Honor, I'll simply leave the remaining point that at no

5    point can the government suggest nor do they have evidence that

6    I'm aware that the defendant was ever arrested in possession of

7    a weapon.

8         The remaining points, Your Honor, I'll simply rest on

9    the fact that we would take the position that the leadership

10   role that the defendant admitted cannot in and of itself stand

11   for the gun enhancement as the government has argued.

12        Thank you, Your Honor.

13        MR. ALESIA:  Judge, just very briefly in reply to

14   that.

15        The government first of all would point out that as

16   opposed to the Ninth Circuit case that counsel relies on, which

17   is US versus Amalyne, to say that Your Honor cannot rely on the

18   type of evidence the government is presenting, in the Seventh

19   Circuit we can.  Judge, US versus Miller, 450 F.3d 270, tells

20   us that prior trial testimony is the most reliable hearsay

21   there is, and it went on to affirm a sentence where that was

22   presented by the government.

23        Also, Judge, the Seventh Circuit has said that the

24   government can't present hearsay evidence at sentencing, even

25   post-Crawford, just like we've done in submitting these

1    transcripts of the grand jury to you.  The cite for that is US

2    versus Roche, which unfortunately I don't have an F.3d cite,

3    but it's 2005 Westlaw 1618816, Seventh Circuit, decided July

4    11, 2005, and other cases.

5         And, Judge, just to say that there is no evidence

6    that Mr. Evans was arrested with a gun is just wrong.  If you

7    look at page 16 of the PSR, lines 393 to 397, back on February

8    12th of 1992, at the age of 18, Mr. Evans, according to the

9    police reports, was arrested at 6217 South Calumet at the time

10   shots were fired.  The defendant was approached for an

11   interview by officers, and a protective patdown search revealed

12   that he was carrying a loaded Davis Industries handgun with a

13   defaced serial number.  So that statement that he was never

14   arrested for a gun is wrong.  Obviously, the case did not

15   result in a conviction, but was found with a gun.

16        THE COURT:  All right.  Well, that's almost beside

17   the point.

18        MR. ALESIA:  Again, that was during the course of the

19   conspiracy.  The conspiracy he pled to lasted from 1989 through

20   2004.

21        MR. McGURK:  Your Honor, in response to the issue of

22   an arrest when he was 16 years old in 1992, certainly the

23   government's contention, as far as every document that I have

24   seen, is his responsibility for the gun does not come from this

25   1992 arrest when he was 16 years old, but rather from his

1   leadership position, the idea being theoretically, based upon

2   his, his standing in the organization, that he is somehow

3   responsible for weapons being used by others.

4           THE COURT: In this case, there is direct testimony

5   by his own cousin and others that he was responsible for, well,

6   one, that he even had guns himself and that he was, and that he

7   was certainly responsible for the guns found in apartment 1007.

8           There's plenty of, there's an awful lot of evidence

9   here that, beyond the fact that he was, had a leadership role

10   that directly links him to responsibility and foreseeability

11   and, in fact, direct possession of guns. You have really

12   offered no evidence at all to refute the evidence in the

13   record. So I am going to give him the two-point enhancement.

14           All right. Let's talk about amount.

15           MR. ALESIA: Sure, Judge.

16           Judge, regarding the drug quantity argument, again,

17   I'll begin by referring to the trial testimony of Mr. Hall and

18   the trial testimony of Mr. Voker. Specifically, Judge, I'll

19   start with Mr. Voker.

20           He told you that Mr. Evans was a board member. He

21   told you that he, meaning Mr. Voker, had to pay a street tax to

22   sell heroin at the Calumet building and that off and on,

23   beginning in early 2000 continuing through 2004, that monthly

24   payment was approximately 20 to $25,000 a month, then became

25   about 20 to $40,000 a month, and Mr. Voker was also selling

1   crack under that same ability or that same authorization based

2   on the street tax sales.

3           He said on page 68 of his trial testimony from

4   February 16th that in total, from about late 2003 through

5   August of 2004, those drug lines that Mr. Voker was running

6   based on the authorization from Mr. Evans and the street taxes

7   being paid to him amounted to 40 to 50 kilograms of cocaine

8   which is obviously much greater than 1.15 kilograms of cocaine.

9           As corroboration for that testimony, we have the

10   testimony of Mr. Hall.  I'm sorry.  Of crack cocaine, not

11   powder cocaine.  You have the testimony of Mr. Hall, who told

12   you that C-Mac or Mr. Evans collected dues.  You had the

13   drug -- the Title III calls which corroborated Mr. Hall's

14   testimony, calls 1273 and 2392, then the other calls mentioned

15   on page 79 of his trial testimony where Mr. Hall told you that

16   between 1998 and approximately 2000, approximately 100

17   kilograms of crack were sold at the Calumet building and that

18   unit 1007 was the main place where Mr. Evans and Mr. Stewart

19   ran their operation out of.

20           And again, getting back to what Mr. Milton Evans told

21   you, that he sold crack cocaine for the various lines

22   controlled by Corey Evans, his cousin, at the building.

23           Also point you out, Judge, point out to you the

24   testimony of Mr. Coates from August 17, 2004, before the grand

25   jury as well as Mr. O'Bryant.  All of them told you about the

1 drug quantities going on here. If you look at just what

2 Mr. Voker said, that 20, anywhere from 20 to $40,000 a month in

3 terms of the drug quantities, if you broke that down, $20,000,

4 divided by $10 dime bags, which is what the typical drug

5 equalled to, for retail sales would be 2,000 dime bags per day,

6 and each dime bag contained about .1 grams of either heroin or

7 crack cocaine, which would be about conservatively 200 grams

8 per day. And you know this conspiracy lasted from '89 through

9 '90, through 2004. And just in the years where Mr. Evans is

10 alleged to have had that leadership role, even before he was

11 that leader, as you can see way back in 1993, he was working

12 his way up. So he is responsible for all of those drugs that

13 are going on at that building.

14       If you also look, Judge, to what Mr. Milton Evans

15 told you or told the grand jury that you have in front of you,

16 beginning on page 8 and 9. How Milton Evans came into this

17 gang, Judge, was because he needed money. And he went to his

18 cousin. Both of his parents were deceased at the time. And

19 instead of providing for his cousin, telling him to get a job,

20 stay in school, according to Milton Evans, the defendant told

21 him, well, why don't you join the gang and come work at one of

22 my lines, and you can make some money. Which, unfortunately,

23 is what Milton Evans chose to do beginning in 1996. He

24 testified that he sold crack for the defendant Corey Evans and

25 that he used to go to apartment 1007 where Evans and Stewart

1  passed out the packs of either 25, 50, or 1,000 dime bags at a

2  time, and once the money, those drugs were sold, the money was

3  returned to that location.

4        Milton Evans also said on occasion he saw his cousin

5  Corey Evans selling two to five ounces of crack at a time, and

6  also heroin was sold at all of those lines under the control of

7  Mr. Evans as the board member at the Calumet building.

8        Judge, we believe that there's just ample evidence in

9  this case.  You also heard testimony during the trial of

10  Mr. White from several officers who recovered drugs at the

11  Calumet building at that time that Mr. Evans ruled there.  I

12  believe there's an incident on November 1st of 2001 where an

13  officer going into one of those dumpsters that was referred to

14  in the back of the building, found 600 dime bags of heroin,

15  thousands of dollars, and a .357 revolver.  Also, again, if you

16  look at Government's Document 32 from several different

17  apartments, there are just, you know, cash hordes of 12,000,

18  9,000, $3,000, all the guns I've mentioned, hundreds of dime

19  bags of crack cocaine and heroin recovered from all of those

20  locations, which all support and corroborate the testimony of

21  the individual who testified at trial and also the people, the

22  Black Disciple members who testified in the grand jury.

23  Remember, Judge, these are not people, these are not strangers

24  or outsiders, these are not people just coming into the

25  building to buy a dime bag here and there.  These are the

1   defendants' closest associates, Mr. Coates, another board

2   member; Mr. Milton Evans, his cousin; Paris O!Bryant, a BD

3   member from there; Varney Voker, the person who was paying the

4   street tax; Mark Hall, a prolific drug dealer in his own rite.

5           All of these people, Judge, have testified reliably

6   and truthfully, and the evidence rises to the point where the

7   drug level of 38 is absolutely met in this case, so that at

8   least 1.5 grams of crack and at least 150 kilograms of cocaine,

9   as well as the 30 kilograms of heroin, for a level 38.

10          THE COURT:  Thank you.

11          MR. McGURK:  May I, Your Honor?

12          THE COURT:  Yes.

13          MR. McGURK:  Your Honor, I won't repeat my arguments

14  about the issues relating to Mr. Evans, Mr. Corey Evans not

15  being present for the trial or, of course, for the grand jury

16  proceedings.

17          But I would like to refer the Court to a letter sent

18  by Mr. Voker to the Court which was addressed to the Court and

19  apparently was filed on November 4th, 2005.  I'll provide a

20  copy of that.  I don't know what the Court document number is.

21          THE COURT:  I've never seen this letter.

22          MR. McGURK:  Pardon me, Your Honor?

23          THE COURT:  I've never seen this.

24          MR. RUBINSTEIN:  Your Honor, Mr. Voker actually

25  testified about it at trial.  It was a sort of backing off, if

1  you will, of his statements, and my recollection is he --

2        THE COURT:  Oh, all right.  I guess I'm mistaken.

3        MR. RUBINSTEIN:  He testified about it at trial and

4  stated he was unhappy with the plea deal but ultimately decided

5  to go forward with it.  That's my recollection of the

6  testimony.

7        THE COURT:  All right.  I didn't remember ever

8  getting a letter in this case saying I had no authority.

9        MR. McGURK:  Well, Your Honor, without going through

10  all of the detail, I would at a minimum suggest that calls into

11  question the reliability of Mr. Voker's testimony, certainly as

12  it relates to Mr. Corey Evans.

13        The other point that I would certainly raise, Your

14  Honor, is that the government is discussing the quantity of

15  drugs in this conspiracy at a time when certainly even the

16  government doesn't contend Mr. Evans was a board member.  In

17  other words, he's being charged with --

18        THE COURT:  He doesn't have to have been a board

19  member to be responsible for the drugs in the conspiracy.

20        MR. McGURK:  Well, Your Honor, in terms of the issue

21  of foreseeability, if he is, his position as a board member,

22  his position --

23        THE COURT:  Okay.  What years was he a board member?

24        MR. McGURK:  Well, Your Honor, I certainly think

25  there was certainly no evidence that he was a board member as

MICHAEL P. SNYDER, Official Reporter

1  far back as 1998.

2          THE COURT:  1998?

3          MR. McGURK:  1998.  And at least if I recall

4  counsel's statement now in terms of how far back the time

5  period is that the government is asserting Mr. Evans is

6  responsible for, and I will rely upon the Court's recollection,

7  but it certainly seems to be at a much earlier point in time.

8          The point being, Your Honor, is I think that the

9  ability of Mr. Evans to have the particularized finding of what

10  drugs are attributable to him based on the allegations that the

11  government has relied upon here are in it, and on that basis,

12  the only other point, your Honor, is I don't know whether the

13  letter of Mr. Voker was marked as an exhibit in the prior --

14          It was not?

15          Then I would ask that the Court take notice.

16  Apparently it was filed in the Court file, but I don't know in

17  which case.

18          THE COURT:  All right.

19          MR. McGURK:  Thank you, Your Honor.

20          THE COURT:  Is there anything more you want to say?

21          MR. ALESIA:  Nothing else, Judge, thank you.

22          THE COURT:  I guess I'd like to pin down a little

23  more when he was in a position of authority.

24          MR. ALESIA:  Judge, I believe that the testimony

25  proffered at trial as well as in the transcripts would show

1   that in or about I believe the 1990s, '98 and '99 through 2004,

2   at times there was a period of approximately a year or so when

3   he was taken out of play by Mr. Jehan, who was even a

4   higher-ranking member than Mr. Evans.  And I'm proffering and

5   summarizing the evidence.  So it was at least a period of I'd

6   say at least three or four years in the late '90s through the

7   early 2000s.

8           THE COURT:  And during that period of time, how much

9   of these drugs that you're talking about was being sold?

10          MR. ALESIA:  Judge, I believe Mr. Voker testified --

11          MR. RUBINSTEIN:  Your Honor, Mr. Voker testified that

12  from late 2003 through 2004 there was well in excess of 1.5

13  kilograms of crack cocaine sold while he was paying the street

14  tax to Mr. Evans.  It's our position it was quite clear that

15  during that period, right before the takedown, he was clearly

16  in charge of the Calumet building.

17          THE COURT:  I'm not questioning that.  I was trying

18  to remember the dates and how much -- I just want to know that

19  the amount of drugs in that period of time, if it can be

20  specific, meets this level.

21          MR. ALESIA:  Yes, Judge.  Specifically, Mr. Hall

22  testified that from 1998 through 2000, he supplied,

23  approximately 100 kilograms of crack cocaine were sold at the

24  Calumet building and that he was one of the suppliers, he and

25  obviously Mr. Coates was, through Mr. Hall, of a good portion

1  of that cocaine and crack cocaine.  Mr. Voker during his trial

2  testimony on February 16th of this year, page 68, said that he

3  sold 40 to 50 kilograms of crack cocaine from late 2003 to

4  August of 2004 at the Calumet building which he was paying

5  taxes for, which, of course, is what Mr. Evans would be

6  responsible for.  And Mr. Evans himself during his plea

7  colloquy, when Your Honor asked him why did, with respect to

8  the drugs, the defendant say that "I just accepted money every

9  month from Varney Voker."  I'm on page 16 of the plea colloquy.

10         And you asked him, "And what did Varney Voker do?"

11         And Mr. Rubinstein responded, and then you asked

12  Mr. Evans, "Okay, so why did he give you money?"

13         And the defendant stated, "Because I was the board

14  member."

15         And you asked Mr. Evans, "And was the board, what did

16  the board member do with respect to this drug selling?"

17         And Mr. Evans himself under oath stated, "I oversee

18  brothers going, I mean, I oversee brothers incarcerated, make

19  sure they got out."

20         Mr. Rubinstein interjected, "And I think Mr. Evans

21  would agree, as a board member, he received a tax for the

22  privilege of these other BD members to sell drugs within his

23  territory and specifically at the Calumet building."

24         And you asked Mr. Evans, "Did you, was that true?"

25         And his answer was, "Yes."

1        So, Judge, if you look at all that testimony --

2        THE COURT:  All right.  I mean, we are just talking

3   about amounts and dates.

4        MR. ALESIA:  Right.

5        THE COURT:  If we are going to be specific, I don't

6   want an issue here.  So we are talking about --

7        MR. ALESIA:  We are talking about from 1998 through

8   2003, early 2004, between just the testimony of Mr. Hall and

9   Mr. Voker.  We are dealing with at least 40 up to 100 kilograms

10  of crack cocaine that is sold at that building.

11       THE COURT:  Anything besides crack?

12       MR. ALESIA:  Heroin, Judge, also.

13       THE COURT:  What did they say about heroin or powder

14  cocaine?

15       MR. ALESIA:  It was 20 to -- Mr. Voker testified it

16  was 20 to $27,000 per day, which is what I was talking about

17  earlier how you broke that amount down.  If you divide

18  conservatively $20,000 by $10 per dime bag, which is the

19  typical amount that was sold there, based on all the testimony,

20  that would be 2,000 dime bags per day.

21       THE COURT:  Is that of crack or of powder?

22       MR. ALESIA:  Heroin, Judge.

23       THE COURT:  Heroin?

24       MR. ALESIA:  We are talking about heroin, and that

25  would be, that would equal to 200 grams per day, obviously,

1  when one week is 1400 grams, which is a kilo and a half of

2  heroin.

3              THE COURT:  All right.  I reread yesterday the Hall

4  testimony.  Let me look again at the Voker testimony.

5              MR. ALESIA:  I think Mr. Hall just talked about the

6  cocaine and crack cocaine.  It's Mr. Voker that talked more

7  about the heroin.

8              THE COURT:  All right.  Let me find the Voker.  Where

9  is that?

10             MR. ALESIA:  If you want to look at February 16th

11  beginning around page 46 is where Mr. Voker begins talking

12  about street taxes and the heroin, and it goes to about page

13  53.

14             THE COURT:  Do you have that there?

15             MR. ALESIA:  I do, Judge, and I could --

16             THE COURT:  It's apparently in a different folder.

17             MR. ALESIA:  It begins on page 46, Judge (tendering).

18             THE COURT:  All right.

19             MR. ALESIA:  And, Judge, just while you're reading

20  that, to finish up with Milton Evans' testimony, as I stated,

21  in the grand jury he told the grand jurors on page 18 that, or

22  earlier he joined the BDs in 1996, he remained a member until

23  at least his arrest on that one case in 1999.

24             So conservatively we'll just talk about the years '97

25  to '98.  He said that he worked selling crack cocaine for the

1   defendant Corey Evans from 8 a.m. to 10:30 p.m. five days a

2   week.  Each day I worked I sold a total of five to six 25 and

3   50-packs, meaning 25 or 50 dime bags in each pack.

4          Conservatively, if you look at those numbers, Judge,

5   a 25-pack, we won't even use the 50-pack, 25-pack times five a

6   day he sold would be 125 dime bags, which equals to about 12.5

7   grams of crack cocaine.  Now, this is just Milton Evans

8   himself.

9          THE COURT:  Right.

10         MR. ALESIA:  As you know, there were several lines

11  going on.  The operation ran 24 hours a day.  If you multiply

12  12.5 grams a day times five days a week.  It's 62.5 grams.

13  Just one year, not even looking at all three or four years he

14  worked there, just one year at that rate, 52 weeks times 62.5

15  grams of crack cocaine per week comes to 3200 grams per year,

16  which is three kilograms of crack just that Milton Evans sold

17  under the direction of Corey Evans that he would be responsible

18  for.  That alone earns him a level 38.  But, again, you have

19  all the other evidence and testimony that we have also talked

20  about.

21         THE COURT:  Do you have anything more you want to

22  say?

23         MR. McGURK:  No, Your Honor.  We'll rest on our

24  argument.

25         THE COURT:  All right.  Well, the evidence is

1   overwhelming that the amount of crack and the amount of heroin

2   that was sold under the direction of Mr. Evans warrants a level

3   38.

4            Okay.  Then I guess we should talk about, so --

5            MR. ALESIA:  And we are giving Mr. Evans three levels

6   off for acceptance, Judge.

7            THE COURT:  That's the main thing I want to talk

8   about.  This time I guess he's got -- it's an offense level I

9   believe of 41 and a criminal history category of III, is that

10  correct?

11           MR. ALESIA:  That's correct, Judge.  And the

12  applicable range at this point would be 360 months on the low

13  end to life.

14           Judge, regarding what the appropriate sentence should

15  be in this case, Your Honor has heard for almost two and a half

16  years now evidence in this case and you've seen many people

17  come before you, about 41 to date, that have been sentenced.

18  All but two of those or three of those pled guilty pursuant to

19  plea agreements with the government, be it with or without

20  cooperation.

21           I will tell you at the outset, Judge, Mr. Evans did

22  come in at some point following his arrest.  I'm not, I don't

23  have the exact date.  He did come in and met with agents on one

24  occasion, Judge.  After that, he ceased proffering any other

25  testimony, there was no further cooperation, and no cases or

34

1   indictments flowed from the limited information he gave.  So

2   which puts him right off the bat in a different situation from

3   the other two people I'll compare him to, and that would be

4   Mr. Stewart and Mr. Herbert who also pled blind but did

5   actually in Mr. Stewart's case go so far as to testify in the

6   grand jury and provide additional information to the

7   government, as well as Mr. Herbert did the same although he

8   didn't go in the grand jury.

9          THE COURT:  I thought you just said Mr. Herbert.  Who

10  else?

11         MR. ALESIA:  Mr. Stewart, Judge, actually went into

12  the grand jury, and Mr. Herbert.  Other than Mr. Thompson, who

13  obviously hasn't been sentenced yet, those are the only four

14  people in this case that entered a blind plea of guilty.

15         What a reasonable sentence in this case, Judge, is

16  within the range.  If you look at the 3553 factors, Your Honor

17  needs to consider a sentence that would reflect the seriousness

18  of the offense, provide a just punishment, promote the law, and

19  it's based on the defendant's history and characteristics, to

20  deter defendant and others from similar conduct, and most

21  importantly, Judge, to protect the public from the defendant

22  and the conduct that he engaged in in this case.

23         Based on all the evidence and everything you know

24  about the defendant at this point, Judge, it simply does not

25  call for a variance from that range.  If you look at the

1  defendant's life, and we'll start with his history and

2  characteristics, if you look at the PSR beginning on page 8 and

3  going to page 12, you look at what happened to the defendant.

4           Back when he was a juvenile at 16 years of age he was

5  arrested and convicted for three separate drug offenses, one a

6  distribution, one a simple possession, and one a possession

7  with intent to distribute, as a juvenile.  The judge there gave

8  him probation.  As a juvenile, Judge, did he learn his lesson?

9  Did he try and distance himself from the gang?  Did he try and

10 stop selling drugs?  Did he try and make a life for himself and

11 go to school?  And the answer is no.  He thumbed his nose at

12 that chance at that time.

13          On page 12, you look at he again then as an adult was

14 found guilty of selling crack cocaine, this time as an adult in

15 an adult court at 26th Street.  The judge again gives him a

16 break and gives him probation.  At that point does he take

17 advantage of that situation, try and turn his life around, move

18 out of town, do whatever he has to do to distance himself from

19 this conspiracy and the gang?  And again, Judge, the answer is

20 no, because as he told you, or as he told the probation

21 officer, on page 21, line 507 to 508, "Defendant Evans further

22 reported that he was financially supporting each of his

23 children when he wasn't incarcerated in this matter."

24          And look at how it is that he supported those

25 children.  If you look at page 23 of the PSR on the very top

 1    page, line 567, "When the probation officer asked Mr. Evans as

 2    to previous employment in the past several years, the defendant

 3    Evans candidly admitted that he has never sustained legal

 4    employment. He supported himself and his family from proceeds

 5    earned from the sale of narcotics."

 6          You can't stop the cycle, Judge, if you have people

 7    like Corey Evans out there indoctrinating children like Milton

 8    Evans, his own cousin, into the gang when he, here's a child,

 9    an impressionable child who has no parents and looks up to his

10    cousin, "Hey, I need a little money, can you help me out?"  And

11    what does he do?  He indoctrinates him into the BDs, a violent

12    gang, and he indoctrinates him into a drug conspiracy to sell

13    drugs.

14          The defendant in his motion for a variance talks

15    about a horrendous childhood.  I ask you, Judge, what about the

16    horrendous childhood of those children who for 15 years, from

17    1989 through 2004, lived and grew up in the Calumet building,

18    who daily had to be subjected to patdown searches just to go to

19    school, just to go out and play in the parking lot, to watch

20    their mothers and their uncles and their aunts and their

21    grandmothers be subjected to that same kind of conduct, to have

22    bullets whizzing by their heads and 24 hours a day to have drug

23    dealers selling drugs, peddling drugs, yelling out "Heads up,

24    rocks, blows," 24 hours a day?

25          And I mention all this, Judge, because he was at the

1    top of that heap.  He was the guy in charge for several years

2    of that activity.  He could have put an end to it.  He chose

3    not to because it put money in his pockets and fed his family.

4    And you have the other evidence, Judge, about Mr. Voker telling

5    you about the cars that Mr. Evans drove and what he did with

6    his money.  He never tried, Judge, never once.  He never gave

7    those other people, those other children at that building any

8    other kind of role model to look at other than somebody who

9    would sell drugs, had money in their pockets, and carry around

10   drugs to protect that operation.

11          And what else is he responsible for as that board

12   member?  Well, what is the other thing you heard about, Judge,

13   through all this testimony?  How the gang kept that discipline,

14   how where Evans kept the discipline in that gang, and that was

15   through brute violence, abstract violence.

16          Look at what Milton Evans told you.  His own cousin,

17   "Get out of town because we think you're a snitch, or we're

18   going to kill you."  It's that simple.  The gang came before

19   his own blood.

20          Look at the testimony that we talked about, Judge,

21   they had from Varney Voker from the witness stand at trial and

22   in his grand jury testimony telling you how he received a

23   violation at the orders of Mr. Evans because there was a fight

24   at that night club at that party that Mr. Hall was promoting.

25   Look at the testimony of Milton Evans who -- I'm sorry -- of

1  Paris O'Bryant, a Black Disciple member who testified in the

2  grand jury about beatings with fists and baseball bats that

3  were sent by lower ranking members that sent them to the

4  hospital based on orders of the defendant.

5          This is the person who asks for a variance from this

6  guideline?  He does not deserve it, Judge.  He did nothing to

7  deserve anything but a guideline sentence in this case.

8          I would ask --

9          THE COURT:  I have one question about it.

10         MR. ALESIA:  Yes.

11         THE COURT:  Which is, it has to mean something to

12 have pled guilty and accepted responsibility.  What if he had

13 gone to trial?  Wouldn't that be the same?

14         MR. ALESIA:  If he had gone to trial, Judge, he would

15 -- if he had gone to trial, his guideline would have been 44

16 and III, which would have been off the charts, which would have

17 been a life period.  So it would have been a significant, it

18 would be even more significant if Your Honor sentenced him to

19 anything less than life in that case.  Also, as you know, based

20 on his plea agreement, he did, he is receiving, he's receiving

21 those acceptance points.

22         THE COURT:  Well, I just want to make sure that it

23 means something.  It doesn't mean anything if the sentence is

24 the same thing.

25         MR. ALESIA:  But it wouldn't be the same thing.  It

1   would have been like, he would not have gotten acceptance.  The

2   government's position at that point would have been, number

3   one, he didn't plead --

4           THE COURT:  No, I understand he wouldn't have gotten

5   acceptance.  But do you understand what I'm saying?

6           MR. ALESIA:  Yes.

7           THE COURT:  The guideline sentence --

8           MR. ALESIA:  The low end would have been life in that

9   case.

10          THE COURT:  All right.

11          MR. ALESIA:  So there would, there would be a

12  significant difference.

13          THE COURT:  Why is that?  The low end for White

14  wasn't life.

15          MR. ALESIA:  No, it wasn't, Judge.  I don't have

16  Mr. White's PSR in front of me, but -- I don't know.

17          That's correct, Judge, in the old guideline which

18  Mr. White was sentenced under, because that shooting occurred

19  in 2001, which was prior to the new version of the guidelines

20  which are applicable to Mr. Evans, it was a five-level

21  difference between --

22          THE COURT:  Wait a minute.  Are you arguing -- what

23  level of Evans, if we were under the sentencing guidelines,

24  what level would be the most favorable to him?

25          MR. ALESIA:  To Mr. Evans?  It wouldn't matter.  The

1   guidelines for Mr. Evans were the same then as they were now.

2   However, as to Mr. White, because of that shooting, back then

3   the guideline I believe was a 20, the base was a 28, now it's a

4   33, and Mr. White got the benefit of that. However -- plus he

5   didn't get a four-level increase for leader/organizer role.

6           THE COURT:  Oh, well, that's true.

7           MR. ALESIA:  So all he had was the two levels for the

8   gun enhancement.  So that's a four-level difference plus the

9   five on the shooting, and also, Judge, again, as I point out,

10  without acceptance Mr. Evans in this case would be a 44/I,

11  which starting at 40 -- I'm sorry -- a 40 --

12          THE COURT:  44/I.

13          MR. ALESIA:  A 44/III, category III, which even at a

14  43/III is life, 44 --

15          THE COURT:  Which are you talking about?  Which

16  guideline manual, 2?

17          MR. ALESIA:  Whatever guideline manual you want to

18  look at, Judge, the sentencing table I don't think has changed

19  in several years, at least during the course of this

20  conspiracy --

21          THE COURT:  No, I see.

22          MR. ALESIA:  -- beginning In the late 1990s.  A 44

23  and III is just off the charts, it's not even on the table.

24          THE COURT:  I see what you're saying.  Okay.

25          MR. ALESIA:  Thank you, Judge.

1    THE COURT:  Counsel.

2    MR. McGURK:  Yes, Your Honor.

3    Your Honor, the government does not challenge nor do

4  I think that they attempt to dispute the PSR's assertion that

5  the defendant's mother was herself addicted to drugs and died

6  at a very young age and that he was, if you will, farmed out to

7  be raised by an uncle who it turns out himself was addicted to

8  heroin, and that the reality that he, that the defendant was

9  effectively thrown into the streets without any of the support

10  of a family, any of the support that virtually everyone in this

11  courtroom has had the benefit of.  This circumstance I believe

12  the Court has got to take into consideration.

13    The 4553(a) -- I'm sorry -- the section 3553(a)

14  provisions certainly do include the Court consider the history

15  and characteristics of the defendant.  The government suggests

16  because of the nature, the serious nature of the offense, in

17  effect that the serious nature of the offense trumps that

18  provision.  Your Honor, it has to be considered, and the, the

19  issue of whether the circumstances of Mr. Evans' upbringing and

20  youth affected him it seems cannot be, the government can't

21  suggest that it had no effect.  And the sledgehammer that the

22  government is trying to use in this case suggests that it would

23  not make a difference that the defendant had benefits or

24  suffered extreme privation.  The Court I believe must and

25  should consider that difference.

1    The issue in terms of effectively seeking to

2  incarcerate the defendant at the low end for 30 years at this

3  point I believe ignores the individual characteristics of the

4  defendant, and it certainly reflects excessive treatment of the

5  defendant based upon his circumstances.

6    The issue in terms of the circumstances of taking

7  care of his family, in effect, the defendant is condemned

8  because he did that by the government because of the source of

9  drugs.  So in effect the issue of the defendant's care for his

10  family, because of the fact that the underlying income was from

11  drug sales, in the government's view, has to be ignored.

12    Your Honor, I can only suggest that the component

13  that can't be ignored is the defendant's upbringing prior to

14  his being an adult.  I believe under the provisions and under

15  the case law, the Court has to consider that.  The sentence

16  that the government seeks here we believe is excessive and that

17  the Court should depart as per the motion that was filed on

18  July 25, 2005.

19    THE COURT:  Well, the Seventh Circuit has said that

20  really we don't look at departures anymore; it's a question of

21  what is the appropriate sentence under Section 3553.

22    MR. McGURK:  Well, our suggestion, therefore, Your

23  Honor, under that characterization, is the appropriate sentence

24  here would be a sentence certainly less than the 360 months the

25  government starts at the low end of the sentence, and,

1  therefore, we respectfully request that the Court impose a

2  substantially lesser sentence than that.

3         THE COURT:  All right.  Mr. Evans, do you have

4  anything you want to say?

5         THE DEFENDANT:  Yes, Your Honor.

6         First, I want to apologize to the Court and my

7  family.

8         Second, I want to say, well, Your Honor, I know I'm

9  not perfect, and I know I made a lot of mistakes.  But the

10  majority of this testimony is not true, it's not true, Your

11  Honor.  And I know I was a board member, but as far as

12  everything else, it's not true.

13         And what I'm trying to be saying is I have kids, and

14  I love kids, and everybody in that residence know me, and they

15  know if I could do anything as far as the residents, anything

16  to help them, I would.  And I'm sorry they are not here on my

17  behalf, but I'm standing here.  It don't take no 20 or 30

18  years, Your Honor.  I know I made a big mistake.  I knew my

19  momma left, my sister was pregnant, I was 14, I was 15.  I know

20  I shouldn't have turned to drugs on the street, but I ain't had

21  nothing else to turn to, Your Honor, and all I'm asking is that

22  you have mercy on me so I can give back to my kids and show

23  them the way so they won't end up in the same predicament.

24         That's it, Your Honor.

25         THE COURT:  Thank you.

MICHAEL P. SNYDER, Official Reporter

1          I'm supposed to look at the guideline calculations

2  and to consider the factors under 3553 including the nature and

3  circumstances of the offense.  We'll start with that.

4          It just is really horrendous in this case.  I think

5  everything Mr. Alesia said, which I suppose we tend to not

6  think about, is just how, what hell this whole operation made

7  for everybody who was unfortunate enough to live around there

8  and to try to grow up in those circumstances.  And there was an

9  awful lot of.  It wasn't just drugs.  I mean, it was drugs with

10 violence and, indeed, everything that has just been described.

11         The history and characteristics of the defendant.  It

12 is sad that what happens I guess so often is that somebody

13 grows up without a family, ends up turning to this and then I

14 suppose unfortunately, as you then brought your cousin in, and

15 who knows what happened or will happen with your own children.

16 The problem is at some point you have to stop it, you have to

17 say "No, you can't do this; this is what will happen" and to

18 try to show that it really just doesn't pay.

19         So I'm also supposed to look at the need for the

20 sentence to reflect the seriousness of this offense, to promote

21 respect for the law, and to provide just punishment for the

22 offense.  All of those really do cry out for the very lengthy

23 sentence, a very lengthy sentence, as well as to afford

24 adequate deterrence to criminal conduct and to protect the

25 public from further crimes in this case of Mr. Evans.

1      Now, people for the most part do get to an age where

2  they do not, I believe, be likely to continue this kind of

3  criminal activity.  Indeed, it doesn't really seem to end up

4  being relevant since I don't know what, it's not clear that

5  prisons do provide any kind of training.

6      The kinds of sentences available, and then finally to

7  impose a sentence sufficient but not greater than necessary to

8  take care of all of these things.  That's, of course, very

9  difficult to figure out.

10      Pursuant to the Sentencing Reform Act of 1984, I'm

11  going to commit you to the custody of the Bureau of Prisons for

12  a term of 325 months on Count 1 and a term of 48 months on

13  Count 4 to run concurrent.  I will recommend that you go to a

14  facility that offers a comprehensive drug treatment program.  I

15  will not impose a fine.  I find that you cannot afford it given

16  the lengthy time that you will be incarcerated.  You must pay I

17  think it's $200, although it doesn't say that here, special

18  assessment.

19      Upon your release from prison you will be on

20  supervised release for a term of five years on Count 1 and one

21  year on Count 4 to run concurrently.  Within 72 hours of your

22  release from custody of the Bureau of Prisons, you shall report

23  in person to the probation office in the district in which you

24  are released.  While you are on supervised release you shall

25  not commit another federal, state, or local crime, and you

1   shall comply with the standard conditions adopted by the Court.

2   You shall comply with the following additional conditions:  You

3   shall refrain from any unlawful use of a controlled substance,

4   you shall not possess a firearm or destructive device, you

5   shall cooperate in the collection of DNA, and if probation

6   requires it, you shall participate in a drug aftercare

7   treatment program.

8           I believe you have ten days to file a notice of

9   appeal.

10          Is there anything else?

11          MR. ALESIA:  Yes, Judge.  Now that sentence has been

12  imposed on those counts, the government would move to dismiss

13  Count 10 as to this defendant only.  The government would also

14  move to withdraw its previously filed 851 notice of intent to

15  seek enhanced sentence in this case.

16          THE COURT:  All right.

17          MR. McGURK:  Your Honor, I would request that the

18  Court make recommendation to the Bureau of Prisons that the

19  defendant be incarcerated as close to Chicago as possible so

20  his family can visit.

21          THE COURT:  I'll make that recommendation.

22          All right, thank you.

23          MR. McGURK:  Thank you, Your Honor.

24          MR. ALESIA:  Thank you, Judge.

25      (End of proceedings.)

1                    C E R T I F I C A T E

2          I, Michael P. Snyder, do hereby certify that the

3    forgoing is a complete true, and accurate transcript of the

4    proceedings had in the above-entitled case before the Honorable

5    ELAINE E. BUCKLO, one of the judges of said Court, at Chicago,

6    Illinois, on November 17, 2006.

7

8

9                    Official Court Reporter

10                   United States District Court

11                   Northern District of Illinois

12                   Eastern Division

13

14

15

16

17

18

19

20

21

22

23

24

25

MICHAEL P. SNYDER, Official Reporter

Exhibit 3          *United States v. Allen*, No. 96-CR-149-RNC-3, 2019 WL
                   1877072 (D. Conn. Apr. 26, 2019)

2019 WL 1877072
Only the Westlaw citation is currently available.
United States District Court, D. Connecticut.

UNITED STATES
v.
Michael ALLEN

Case No. 3:96-cr-00149-RNC-3
|
Signed 04/26/2019

**Synopsis**
**Background:** Defendant sentenced to 322 months' imprisonment for conspiracy to distribute 5 kilograms or more of powder cocaine and 50 grams or more of cocaine base, carrying firearm in connection with drug trafficking offense, and unlawfully possessing firearm moved pursuant to First Step Act for reduction in sentence.

**Holdings:** The District Court, Robert N. Chatigny, J., held that:

[1] defendant was eligible for reduction, and

[2] the District Court would reduce sentence to time served.

Motion granted.

West Headnotes (9)

**[1]** **Sentencing and Punishment**


Defendant had been sentenced for covered offense within meaning of First Step Act, and thus was eligible for reduction in sentence under First Step Act, where defendant had been sentenced to imprisonment for conspiracy to distribute 5 kilograms or more of powder cocaine and 50 grams or more of cocaine base, an offense involving 50 grams or more of crack cocaine for which penalties had been lowered by Fair Sentencing Act. 18 U.S.C.A. § 924; Comprehensive Drug Abuse Prevention and Control Act of 1970 §§ 401, 406, 21 U.S.C.A. §§ 841(a)(1), 846; 124 Stat. 2372; 132 Stat. 5194.

Cases that cite this headnote

**[2]** **Sentencing and Punishment**


Under the plain language of the First Step Act section regarding application of the First Step Act, whether an offense is a covered offense is determined by examining the statute that the defendant violated. 132 Stat. 5194.

Cases that cite this headnote

**[3]** **Sentencing and Punishment**


It is the statute of conviction, not actual conduct, that controls eligibility under the First Step Act. 132 Stat. 5194.

Cases that cite this headnote

**[4]** **Sentencing and Punishment**


Given the First Step Act's remedial purpose of furthering the Fair Sentencing Act's objective of mitigating the effects of a sentencing scheme that had a racially disparate impact, the First Step Act should be construed to provide courts with discretion to reduce a sentence when the statute the defendant violated has been modified by the Fair Sentencing Act to provide less severe penalties. 124 Stat. 2372; 132 Stat. 5194.

Cases that cite this headnote

**[5]** **Sentencing and Punishment**


The interpretation of the First Step Act to provide courts with discretion to reduce a sentence when the statute the defendant violated has been modified by the Fair Sentencing Act to provide less severe penalties

Case: 1:04-cr-00464 Document #: 2687 Filed: 07/16/19 Page 88 of 112 PageID #:13526

is in keeping with the rule of lenity. 124 Stat. 2372; 132 Stat. 5194.

Cases that cite this headnote

**[6]   Sentencing and Punishment**



With limited exception, any fact that enhances a statutory penalty must be proven beyond a reasonable doubt.

Cases that cite this headnote

**[7]   Statutes**



Congress legislates in the context provided by constitutional principles.

Cases that cite this headnote

**[8]   Sentencing and Punishment**



Any potential sentencing disparity can be considered in deciding whether to grant a sentence reduction under the First Step Act. 18 U.S.C.A. § 3553(a)(6); 132 Stat. 5194.

Cases that cite this headnote

**[9]   Sentencing and Punishment**



District Court would under First Step Act reduce to time served defendant's 322-month prison sentence for conspiracy to distribute 5 kilograms or more of powder cocaine and 50 grams or more of cocaine base, carrying firearm in connection with drug trafficking offense, and unlawfully possessing firearm; defendant already had served 252 months of sentence, and had Fair Sentencing Act been in effect when defendant had been sentenced so as to lower penalties for his conspiracy offense as an offense involving 50 grams or more of crack cocaine, defendant's total sentence would have been 248 months' imprisonment. 18 U.S.C.A. § 924; Comprehensive Drug Abuse Prevention and Control Act of 1970 §§

401, 406, 21 U.S.C.A. §§ 841(a)(1), 846; 124 Stat. 2372; 132 Stat. 5194.

Cases that cite this headnote

<u>RULING AND ORDER</u>

Robert N. Chatigny, United States District Judge

**\*1**   Michael Allen moves pursuant to the First Step Act of 2018, Pub. L. No. 115-391, § 404, 132 Stat. 5194, 5222 (2018), for a reduction in his sentence of 322 months' imprisonment. The sentence was imposed in 1998 based on the then-mandatory sentencing guidelines for offenses involving crack cocaine committed by a person who qualified as a career offender under U.S.S.G. § 4B1.1. The First Step Act is a remedial statute that serves to extend reductions in crack cocaine statutory penalties provided by the Fair Sentencing Act of 2010 to persons previously ineligible for a reduction. For reasons that follow, I conclude that Congress, in enacting the First Step Act, intended to give the Court discretion to reduce Mr. Allen's sentence. Exercising that discretion, I reduce the sentence to time served.

I.

Mr. Allen was indicted along with others for participating in a conspiracy to distribute 5 kilograms or more of powder cocaine and 50 grams or more of cocaine base in violation of 21 U.S.C. §§ 846 and 841(a)(1) (count one). ECF No. 263-6 at 1-2. He was also charged with carrying a firearm in connection with a drug trafficking offense in violation of 18 U.S.C. § 924(c) (count four); and unlawfully possessing a firearm in violation of 21 U.S.C. § 924(g)(1) (count five). <u>Id.</u> at 4-5. At the sentencing hearing, I found by a preponderance of the evidence that Mr. Allen's participation in the drug conspiracy made him accountable for distributing 675 grams of crack cocaine. ECF No. 265-1 at 7. Pursuant to the Sentencing Guidelines Drug Quantity Table, 675 grams of crack cocaine produced a base offense level of 36. <u>See</u> U.S.S.G. § 2D1.1(c) (1997). Mr. Allen was found to qualify as a career offender due to two prior state felonies. Under the Guidelines, an individual who has been designated a

career offender may be subject to an offense level greater than the otherwise applicable level, depending on the maximum statutory penalty for the offense of conviction. In Mr. Allen's case, the offense statutory maximum was life, see 21 U.S.C. § 841(b)(1)(A)(iii) (2009), which resulted in an increase in his base offense level from 36 to 37. See U.S.S.G. § 4B1.1(b). After a three-level reduction for acceptance of responsibility, see id. § 3E1.1, the total offense level was 34, producing a Guidelines range of 262-327 months. See id. ch. 5 pt. 1. Mr. Allen was sentenced to 262 months on count one (the bottom of the then-mandatory range), a mandatory consecutive term of 60 months on count four, and a concurrent term of 120 months on count five, for a total effective sentence of 322 months.

## II.

**[1]** The Fair Sentencing Act of 2010 was enacted in response to widespread criticism of the relatively harsh treatment of crack cocaine offenses compared to offenses involving powder cocaine. See Dorsey v. United States, 567 U.S. 260, 268, 132 S.Ct. 2321, 183 L.Ed.2d 250 (2012). The Act raised the threshold quantities of crack required to trigger enhanced penalties under the Controlled Substances Act. Before 2010, a violation involving 50 grams or more of crack was punishable by a term of imprisonment of at least 10 years and as much as life. See 21 U.S.C. § 841(b)(1)(A)(iii) (2009). Section 2 of the Fair Sentencing Act increased the threshold quantity required to support these penalties from 50 to 280 grams. In addition, the quantity required to trigger a statutory penalty of five to forty years' imprisonment was increased from 5 to 28 grams. Pub. L. 111-220, 124 Stat. 2372, 2372 (2010) § 2, (codified at 21 U.S.C. § 841(b)(1)(A)(iii), (b)(1)(B)(iii) (2010)).

**\*2** The Sentencing Commission amended the Guidelines consistent with the new statutory penalties created by the Fair Sentencing Act. See Dorsey, 567 U.S. at 260, 132 S.Ct. 2321; U.S.S.G. app. C, amend. 750. The amendment lowered the base offense levels associated with different quantities of crack cocaine. See id. § 2D1.1 (2011). The Commission made the amendment retroactive. See U.S.S.G. app. C, amend. 759; U.S.S.G. § 1B1.10(c). As a result, more than 7,700 inmates received sentence reductions by October 2014.[1] The Commission then amended the Drug Quantity Table again, further reducing

the base offense levels associated with different quantities of crack cocaine. See U.S.S.G. app. C, amend. 782.

These amendments to the Guidelines did not benefit all persons who had been sentenced for offenses involving crack cocaine prior to 2010. Pertinent to Mr. Allen's case, the amendments did not provide relief to a person designated as a career offender whose final offense level was dictated by the maximum statutory penalty applicable to his or her offense. See id. § 4B1.1; see also United States v. Mock, 612 F.3d 133, 135 (2d Cir. 2010) ("[D]efendant was sentenced as a career offender under U.S.S.G. § 4B1.1. Consequently, ... he is ineligible for a reduction in sentence based on the crack cocaine amendments." (emphasis omitted)). The issue presented here is whether the First Step Act has given courts authority to grant relief to persons in Mr. Allen's situation when warranted. This a straightforward issue of statutory interpretation.

The pertinent provision, section 404 of the First Step Act, provides: "[a] court that imposed a sentence for a covered offense may, on motion of the defendant, ... impose a reduced sentence as if sections 2 and 3 of the Fair Sentencing Act of 2010 ... were in effect at the time the covered offense was committed." § 404(b), 132 Stat. at 5222. "[T]he term 'covered offense' means a violation of a Federal criminal statute, the statutory penalties for which were modified by section 2 or 3 of the Fair Sentencing Act of 2010," and which was committed before the Fair Sentencing Act was enacted. Id. § 404(a).[2] A defendant who was sentenced under the Fair Sentencing Act, or whose motion under the First Step Act was previously denied, is not eligible for relief. Id. § 404(c). Section 404 further provides that "[n]othing in this section shall be construed to require a court to reduce any sentence pursuant to this section." Id.

Mr. Allen argues that his sentence was imposed for a "covered offense" as defined in the First Step Act, and he is therefore eligible for relief, because he was convicted of violating a statute punishing an offense involving 50 grams or more of crack cocaine, the penalties for which have been lowered by the Fair Sentencing Act. The government contends that Mr. Allen is not eligible for relief because his offense conduct involved 675 grams of crack cocaine, as found by the Court at the sentencing hearing, and the penalty for an offense involving this quantity has not been reduced. In the government's view, in other words, the drug quantity that matters in determining whether a

defendant was sentenced for a "covered offense" within the meaning of the First Step Act is not the statutory quantity in the indictment but the quantity found by the Court at sentencing. [3]

**\*3** **[2]** **[3]** I agree with the defendant's interpretation of section 404. "Under the plain language of [this section], whether an offense is a 'covered offense' is determined by examining the statute that the defendant violated." United States v. Davis, No. 07-CR-245S, 2019 WL 1054554, *3 (W.D.N.Y. Mar. 6, 2019), appeal docketed, No. 19-874 (2d Cir. Apr. 5, 2019). Mr. Allen pleaded guilty to violating a statute applicable to an offense involving 50 grams or more of crack cocaine. The statutory penalty for this offense was modified by the Fair Sentencing Act. As a growing number of courts have concluded, "it is the statute of conviction, not actual conduct, that controls eligibility under the First Step Act." United States v. Martin, No. 03-cr-795, 2019 WL 1558817, at *3 (E.D.N.Y. Apr. 10, 2019) (quoting Davis, 2019 WL 1054554, at *2). [4]

**[4]** **[5]** The government suggests that the term "violation" in the definition of "covered offense" creates an intrinsic ambiguity because it can be construed to refer to the facts of the defendant's "violation" as found by the Court. To the extent the statutory text is ambiguous, the ambiguity is dispelled by considering the purpose underlying the First Step Act. Both parties agree that no legislative history is available to document the purpose of section 404. It is undisputed, however, that Congress wanted to further the Fair Sentencing Act's objective of mitigating the effects of a sentencing scheme that had a racially disparate impact. See Dorsey, 567 U.S. at 268, 132 S.Ct. 2321. Given this remedial purpose, the First Step Act should be construed to provide courts with discretion to reduce a sentence when the statute the defendant violated has been modified by the Fair Sentencing Act to provide less severe penalties. E.g., Noel v. N.Y.C. Taxi & Limousine Comm'n, 687 F.3d 63, 68 (2d Cir. 2012). This interpretation of the statute is in keeping with the rule of lenity. See Pierre, 372 F.Supp.3d at ——, 2019 WL 1495123, at *5 (applying rule of lenity to Section 404); see also United States v. Simpson, 319 F.3d 81, 86 (2d Cir. 2002) ("[T]he rule of lenity is generally applicable to the Sentencing Guidelines as well as criminal statutes."); United States v. Fields, 113 F.3d 313, 325 (2d Cir. 1997) ("Simply put, the rule of lenity requires a sentencing court

-- when faced with an actual ambiguity over which of two penalties should apply -- to select the lesser penalty.").

In the absence of legislative history, additional guidance can be drawn from the Commission's estimate that 2,660 offenders are eligible for relief under section 404. [5] As the Commission has explained, this estimate includes people like Mr. Allen whose base offense level under the career offender guideline has been lowered as a result of the Fair Sentencing Act. See Sentence and Prison Estimate Summary at 2 (noting that the estimated 2,660 encompasses persons incarcerated as of May 26, 2018, "whose sentencing range would be lower under the current version of USSG § 2D1.1 than the version of that guideline in effect on the date they were sentenced, *or who would have a lower sentencing range under USSG § 4B1.1 than the range determined by the court at sentencing (due to a change in the statutory maximum penalty that applied in the case).*" (emphasis added)).

**\*4** **[6]** **[7]** The government's interpretation of section 404 would preclude a court from granting relief when, as in this case, the record contains a judicial finding of a drug quantity of 280 grams or more of crack cocaine based on a preponderance of the evidence. Today, with limited exception, any fact that enhances a statutory penalty must be proven beyond a reasonable doubt. Alleyne v. United States, 570 U.S. 99, 103, 133 S.Ct. 2151, 186 L.Ed.2d 314 (2013); Apprendi v. New Jersey, 530 U.S. 466, 476, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000). While Alleyne and Apprendi do not provide retroactive relief, Congress legislates in the context provided by constitutional principles. See Rust v. Sullivan, 500 U.S. 173, 191, 111 S.Ct. 1759, 114 L.Ed.2d 233 (1991) ("[W]e assume [that] Congress legislates in light of constitutional limitations."). Construing section 404 in the context provided by Alleyne and Apprendi, courts should reject a reading of the statute that would preclude eligibility for relief under the First Step Act due to a judicial finding of drug quantity many years ago.

**[8]** The government has argued elsewhere that the defendant's reading of "covered offense" in section 404 would provide a windfall to inmates whose offense conduct involved 280 grams or more of crack cocaine but who were sentenced before the Fair Sentencing Act, thereby creating an unwarranted sentencing disparity. See Resistance to Motion for Reduction of Sentence Under First Step Act at 5, Dodd, 372 F.Supp.3d 795, ECF

No. 767. The risk identified by the government does not provide a sufficient justification to support a narrow reading of the First Step Act. Construing section 404 to extend eligibility for a sentence reduction to persons whose offense conduct involved 280 grams or more vests courts with discretion to reduce a sentence or decline to do so. See § 404(c), 132 Stat. at 5222. Any potential disparity can be considered in deciding whether to grant a sentence reduction under the First Step Act. See 18 U.S.C. § 3553(a)(6). Accordingly, I conclude that Mr. Allen was sentenced for a "covered offense" within the meaning of the Act and is therefore eligible for a reduction in his sentence.

III.

**[9]** The parties dispute whether the First Step Act authorizes a plenary resentencing. Put differently, they dispute whether, in determining what relief should be granted to Mr. Allen, the Court is confined to considering only the penalties modified by the Fair Sentencing Act and made retroactive by the First Step Act, or should give him the benefit of all changes in applicable law since he was sentenced, including the change mandated by United States v. Booker, which rendered the Guidelines advisory rather than mandatory. 543 U.S. 220, 227, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005). This question need not be resolved here because Mr. Allen is entitled to immediate release based on the Fair Sentencing Act's modification of the statutory maximum penalty applicable to his offense.

If the Fair Sentencing Act had been in effect when Mr. Allen was sentenced in 1998, his statutory drug quantity of 50 grams or more would have carried a maximum sentence of 40 years rather than life, see 21 U.S.C. § 841(b)(1)(B)(iii), so his offense level under the career offender guideline would have been 34 rather than 37. See U.S.S.G. § 4B1.1(b). [6] With a three-level reduction for acceptance of responsibility, his total offense level would have been 31, resulting in a range of 188-235 months on count one, instead of 262-327. See U.S.S.G. Pt. 5. In 1998, I was required to sentence Mr. Allen in accordance with the then-mandatory Guidelines and, in doing so, imposed a sentence on count one at the bottom of the applicable range. Using the new range of 188-235, I similarly find that a sentence at the low end of the range should be imposed now. Adding the mandatory consecutive term of 60 months on count four results in a total sentence of 248 months. Because Mr. Allen has already served 252 months, a sentence of time served is appropriate. See U.S.S.G. § 1B1.10(b)(1)(C) ("In no event may the reduced term of imprisonment be less than the term of imprisonment the defendant has already served.").

IV.

**\*5** Accordingly, the sentence is hereby reduced to time served. The term of supervised release on count one is reduced to 48 months, to run concurrently with the terms of 36 months imposed on count four and 60 months imposed on count five. All other provisions of the judgment will remain in effect.

So ordered this 26th day of April 2019.

**All Citations**

--- F.Supp.3d ----, 2019 WL 1877072

---

**Footnotes**

1   See U.S. Sentencing Commission, Final Crack Retroactivity Data Report Fair Sentencing Act at 2-4 (Dec. 2014), https://www.ussc.gov/sites/default/files/pdf/research-and-publications/retroactivity-analyses/fair-sentencing-act/Final_USSC_Crack_Retro_Data_Report_FSA.pdf.

2   Section 3 of the Fair Sentencing Act, which eliminated the mandatory minimum sentences for simple possession, is not relevant here. See § 3, 124 Stat. at 2372.

3   The parties agree that the other restrictions on eligibility do not apply here. See § 404(c), 132 Stat. at 5222.

4   See also United States v. Dodd, 372 F.Supp.3d 795, 797-98 (S.D. Iowa 2019); United States v. Pierre, 372 F.Supp.3d 17, 21-23 (D.R.I. 2019); United States v. Davis, No. 92-cr-4013 (N.D. Fla. Mar. 6, 2019), ECF No. 2245 at 2, 9; United States v. Glore, 371 F.Supp.3d 524, 530-32 (E.D. Wis. 2019), appeal docketed, No. 19-1663 (7th Cir. Apr. 11, 2019); United States v. Pugh, No. 5:95-cr-145, 2019 WL 1331684, *2 (N.D. Ohio, Mar. 25, 2019); United States v. Vance, Case No. 0:08-cr-60071-WPD (S.D. Fla. Feb. 27, 2019), ECF No. 71 ¶ 11; United States v. Couch, No. 0:08-cr-60236-WP

(S.D. Fla. Feb. 26, 2019), ECF No. 42 ¶ 7; <u>United States v. Laguerre</u>, No. 5:02-CR-30098-3, 2019 WL 861417, at *3 (W.D. Va. Feb. 22, 2019); <u>United States v. Allen</u>, 8:00-cr-378 (M.D. Fla. Feb. 19, 2019), ECF Nos. 63, 66.

5    U.S. Sentencing Commission, <u>Sentence and Prison Estimate Summary: S.756, The First Step Act of 2018</u> at 1-2 (Dec. 21, 2018), [hereinafter Sentence and Prison Estimate Summary] https://www.ussc.gov/sites/default/files/pdf/research-and-publications/prison-and-sentencing-impact-assessments/January_2019_Impact_Analysis.pdf.

6    While the career offender guideline does not apply if it produces an offense level below the base offense level, under today's Drug Quantity Table Mr. Allen's base offense level would be 30 rather than 36 for conduct involving 675 grams of crack cocaine. <u>See</u> U.S.S.G. §§ 4B1.1(b); 2D1.1(c)(5).

---

**End of Document**                                        © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 4    *United States v. Herbert*, 2019 WL 2718498, No. 97-CR-30024, (W.D. Va. Jun. 28, 2019)

2019 WL 2718498
Only the Westlaw citation is currently available.
United States District Court, W.D. Virginia,
Harrisonburg Division.

UNITED STATES of America
v.
Todd HERBERT, Defendant.

Case No. 5:97-cr-30024
|
Signed 06/28/2019

**Attorneys and Law Firms**

Joseph William Hooge Mott, United States Attorneys Office, Roanoke, VA, for United States of America.

MEMORANDUM OPINION

NORMAN K. MOON, SENIOR UNITED STATES DISTRICT JUDGE

**\*1** Defendant Todd Herbert ("Defendant") has filed a motion for reduction of sentence pursuant to the First Step Act of 2018. (Dkt. 249). The motion has been fully briefed and is ripe for review. For the following reasons, the Court will grant Defendant's motion.

An initial indictment was filed against Defendant on March 27, 1997. (Dkt. 1). First and second superseding indictments were filed on June 13, 1997 and September 25, 1997 respectively. (Dkts. 21, 48). The second superseding indictment charged Defendant with conspiracy to distribute cocaine base in violation of 21 U.S.C. 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A). (Dkt. 250). On January 15, 1998, a jury found him guilty of that charge. (Dkt. 116). Pursuant to the then mandatory guidelines, Defendant was sentenced to life imprisonment. Defendant later filed a motion to reduce his sentence pursuant to Amendment 750, this motion was granted and his sentence was reduced to a term of 360 months. (Dkt. 239). Defendant then filed a motion to reduce his sentence pursuant to Amendment 782, this motion was also granted and Defendant's sentence was reduced to 324 months. (Dkt. 242). Defendant filed the instant motion pursuant to the newly enacted First Step Act in February 2019. (Dkt. 249).

Section 404 of the First Step Act of 2018 permits "a court that imposed a sentence for a covered offense" to "impose a reduced sentence as if sections 2 and 3 of the Fair Sentencing Act of 2010 (Public Law 111–220; 124 Stat. 2372) were in effect at the time the covered offense was committed." Pub. L. No. 115-015, § 404, 132 Stat. 015, 015 (2018). A "covered offense" is defined as "a violation of a Federal criminal statute, the statutory penalties for which were modified by section 2 or 3 of the Fair Sentencing Act of 2010 (Public Law 111–220; 124 Stat. 2372), that was committed before August 3, 2010." *Id.*

Modifications of sentences under the First Step Act are governed by 18 U.S.C. § 3582(c)(1)(B), which states: "The court may modify an imposed term of imprisonment to the extent otherwise expressly permitted by statute or by Rule 35 of the Federal Rules of Criminal Procedure." In determining if modification is appropriate, the Court will first address whether a reduction is consistent with the First Step Act, and will then "consider whether the authorized reduction is warranted, either in whole or in part, according to the facts set forth in § 3553(a)." *Dillon v. United States*, 560 U.S. 817, 826 (2010)[1]

**\*2** The parties agree that Defendant's offense of conviction was a violation of 21 U.S.C. §§ 846, 841(a)(1), and 841(b)(1)(A), that the offense was committed before August 3, 2010, and that the applicable penalties were modified by section 2 of the Fair Sentencing Act, which "reduced the statutory penalties for cocaine based offenses" in order to "alleviate the severe sentencing disparity between crack and powder cocaine." *United States v. Peters*, 843 F.3d 572, 575 (4th Cir. 2016). As relevant in this case, section 2 of the Fair Sentencing Act increased the drug quantities necessary to trigger mandatory minimum sentences under 21 U.S.C. § 841(b)(1)(A). Pub. L. No. 111–220, 124 Stat. 2372 (2010). Specifically, the threshold requirement to trigger the mandatory minimum sentence of ten years under 21 U.S.C. § 841(b)(1)(A) was increased from 50 grams to 280 grams. *Id.*

Despite agreement as to these facts, the Government argues that Defendant is not eligible for a reduction pursuant to the First Step Act because the pre-sentencing report ("PSR") states that the offense involved a drug quantity over the revised threshold. (Dkt. 255). In *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), the

Supreme Court held that "other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." In *Alleyne v. United States*, 570 U.S. 99, (2013), 108 the Court expounded upon that rule, holding that "facts that increase the mandatory minimum sentence are [ ] elements and must be submitted to the jury and found beyond a reasonable doubt." Here "the jury found [Defendant] 'guilty beyond a reasonable doubt of knowingly conspiring to distribute or possess with the intent to distribute more than fifty (50) grams of a mixture of substance containing cocaine base.' " (Dkt. 256 1–2 (quoting dkt. 155)). Nevertheless, the Government argues, based on Defendant's PSR, that Defendant's conviction involved a drug quantity above 280 grams, thus he is properly subjected to the revised mandatory minimums set forth in 21 U.S.C. § 841(b)(1)(A).

The Government contends that the *Apprendi/Alleyne* doctrine does not apply in the First Step context because neither case is retroactively applicable on collateral review. (Dkt. 255) (citing *United States v. Sanders*, 247 F.3d 139, 150-51 (4th Cir. 2001)). While the Government is correct that the *Apprendi/Alleyne* doctrine cannot be applied retroactively to afford relief on collateral review, individuals are eligible for relief under the First Step Act where they were convicted of a "covered offense" as defined by Section 404 of the First Step Act. Pub. L. No. 115-015, § 404, 132 Stat. 015, 015 (2018). Accordingly, the Court will consider the crime of conviction not the conduct reported in the PSR. In doing so, this Court joins others in this district finding the holdings of *Apprendi* and *Alleyne* applicable in the First Step context. *See, e.g., United States v. Ancrum*, No. 2-30020, 2019 WL 2110589 (W.D. Va. May 14, 2019) (J. Urbanski) ("although *Apprendi* and *Alleyne* are not retroactively applicable on collateral review, this court joins other courts in finding that their holdings are applicable in the context of the First Step Act") (collecting cases).

Finding relief consistent with the First Step Act, the Court next "consider[s] whether the authorized reduction is warranted, either in whole or in part, according to the facts set forth in § 3553(a)." *Dillon*, 560 U.S. at 826. The Government argues that the Court should exercise its discretion in denying relief for two reasons: (1) relief should be denied based on the drug weight reported in the PSR and "the fact that [Defendant] would remain subject to the higher penalties if he had been prosecuted after the enactment of the Fair Sentencing Act, (dkt. 255 at 9), and (2) relief would provide Defendant with an unfair windfall as compared to defendants sentenced after the enactment of the Fair Sentencing Act, but before *Alleyne*. This Court does not find either argument persuasive."

**\*3** The first argument is based on the hypothetical prosecution of Defendant today. As noted in *United States v. Stanback*, No. 5:02-cr-30020, 2019 WL 1976445, \*4 (W.D. Va. May 2, 2019), "[w]hile it is possible that the government would have proceeded against [the defendant] under 18 U.S.C. § 841(b)(1)(A), it also is possible that it would not ... The retroactive assumption suggested by the government simply is too speculative a basis on which to determine" the eligibility or extent of Defendant's relief. As for the Government's second argument, this Court has already stated that it will consider the sentence a defendant would receive if he "was sentenced under *current* law." *United States v. Lewis*, No. 3:08-cr-39 (W.D. Va. May 8, 2019) (emphasis added). The Government suggests that Defendant should be sentenced as he would have been prior to the decision in *Alleyne*. However, this Court is informed by the *current* constitutional precedent and will make a determination in accordance with those principles. *Stanback*, 2019 WL 1976445 at \*4 ("While the court is aware of the need for consistent sentences among defendants, it is not free to ignore either the law or constitutional precedent.").

Defendant's initial, mandatory sentencing guideline range was life. (Dkt. 250). The Court has taken each opportunity to reduce Defendant's sentence to the bottom end of his adjusted guideline range, resulting in his current sentence of 324 months. (Dkt. 251). The Court has been advised that Defendant's projected release date is June 20, 2022, and, as of March 4, 2019, he had served approximately 243 months of his sentence. (*Id.*).

After consideration of the § 3553(a) factors, including the history and characteristics of Defendant, as well as the parties' arguments, the Court determines that a reduction of Defendant's sentence is appropriate. Specifically, the Court notes that Defendant was not previously credited for the twenty four months he served in New York state custody on a related offense. (Dkt. 249). This Court found that Defendant's PSR "concluded that [his] state offense was 'related' to his federal charges", that the United States Probation Office agreed that Defendant's state offense is

related to his federal offense, and "[t]he Probation Office has also confirmed that [Defendant] served two years in New York custody on the related offense." (Dkt. 245 at 5). If Defendant were sentenced today he would likely be sentenced to the low end of the guideline range, 324 months' imprisonment, and fairness demands this Court take into consideration his time served but not previously credited. Thus, Defendant's sentence will be reduced to 300 months, but not less than time served. His sentence will be followed by a term of supervised release of 4 years. All other terms of the original sentence will remain the same.

The Clerk is directed to send copies of this memorandum opinion and the accompanying order to Defendant, all counsel of record, the United States Probation Office, and the United States Marshals Service, for delivery to the Bureau of Prisons.

**All Citations**

Slip Copy, 2019 WL 2718498

Footnotes

1    Although subsection 3582(c)(1)(B) does not reference 3553(a) as do other 3582(c) subsections, that alone does not bar consideration of other factors. While the *Dillon* Court analyzed the procedures under § 3582(c)(2), the language quoted is reflected in § 3582(c)(1)(B). Additionally, this approach is mirrored by the Fourth Circuit's analysis under Rule 35(b), which allows the Court to "consider other sentencing factors ... when deciding the extent of a reduction." *United States v. Davis*, 679 F.3d 190, 195 (4th Cir. 2012); *see also* United States Sentencing Commission, Office of Education and Sentencing Practice, *FIRST STEP Act*, https://www.ussc.gov/sites/default/files/pdf/training/newsletters/2019-special_FIRST-STEP-Act.pdf (last visited Feb. 11, 2019). ("[T]he courts should consider the guidelines and policy statements, along with the other 3553(a) factors, during the resentencing.").

**End of Document**                              © 2019 Thomson Reuters. No claim to original U.S. Government Works.



Exhibit 5          *United States v. Johnson*, No. 01-CR-543, 2019 WL
                   2590951 (N.D. Ill. Jun. 24, 2019)(Leinenweber, J.)

2019 WL 2590951
Only the Westlaw citation is currently available.
United States District Court,
N.D. Illinois, Eastern Division.

UNITED STATES of America
v.
Sedgwick JOHNSON

Case No. 01 CR 543
|
Signed 06/24/2019

**Attorneys and Law Firms**

Lawrence Oliver, II, Perkins Coie, LLC, Matthew Burke, United States Attorney's Office, Chicago, IL, Pretrial Services, Probation Department, for United States of America.

**MEMORANDUM OPINION AND ORDER**

Harry D. Leinenweber, Judge

**\*1** For the reasons stated herein, Sedgwick Johnson's Motion to Reduce Sentence Under the First Step Act (Dkt. No. 237) is granted.

**I. BACKGROUND**

On July 26, 2001, a federal grand jury returned an indictment charging Johnson and his co-defendants Kalonji McMillian and Raymond Cooper with: (1) one count of conspiracy to possess with intent to distribute more than 50 grams of a mixture containing cocaine base ("crack cocaine") and more than 500 grams of a mixture containing cocaine ("powder cocaine"), in violation of 21 U.S.C. § 846; (2) one count of possession with intent to distribute more than 500 grams of powder cocaine in violation of 21 U.S.C. § 841(a)(1); and (3) one count of possession with intent to distribute more than 50 grams of crack cocaine in violation of 21 U.S.C. § 841(a)(1). The case against Johnson and his co-defendants proceeded to trial by jury on October 15, 2002.

On October 22, 2002, the jury found Johnson guilty on all three charges. Pursuant to count one, the jury made a specific finding that Johnson had participated in the distribution of more than 50 grams of crack cocaine and more than 500 grams of powder cocaine.

Johnson was sentenced on January 30, 2003. The sentencing court found Johnson to be a "career offender" under the U.S. Sentencing Guidelines §§ 4B1.1 and 4B1.2, and calculated his criminal history category as VI and his total offense level as 37. The court sentenced Johnson to a 360-month term of imprisonment on all three counts (which was the low end of the then-applicable guidelines range of 360 months to life), to run concurrently with each other. The court also sentenced Johnson to five years of supervised release on counts one and three, and four years of supervised release on count two, to run concurrently with each other. To date, Johnson has served approximately 216 months of his sentence.

Johnson now moves this Court for a reduced sentence under Section 404 of the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194 (2018) ("the First Step Act"), and Sections 2 and 3 of the Fair Sentencing Act of 2010, Pub. L. No. 111-220, 124 Stat. 2372 (2010) ("the Fair Sentencing Act"). Johnson requests that the Court reduce his 360-month sentence for distribution of crack cocaine to a 262-month sentence-the low end of the currently applicable guidelines range.

**II. DISCUSSION**

The First Step Act effectively makes the provisions of the Fair Sentencing Act, passed in 2010, retroactive. Section 404 of the First Step Act states, in relevant part:

(a) DEFINITION OF COVERED OFFENSE. In this section, the term "covered offense" means a violation of a Federal criminal statute, the statutory penalties for which were modified by section 2 or 3 of the Fair Sentencing Act of 2010 (Public Law 111-220; 124 Stat. 2372), that was committed before August 3, 2010.

(b) DEFENDANTS PREVIOUSLY SENTENCED. A court that imposed a sentence for a covered offense may, on motion of the defendant, the Director of the Bureau of Prisons, the attorney for the Government, or the court, impose a reduced sentence as if sections 2 and 3 of the Fair Sentencing Act of 2010 (Public Law 111-220; 124 Stat. 2372) were in effect at the time the covered offense was committed.

**\*2** PL 115-391. Relief under the First Step Act is discretionary. *Id.* § 404(c) ("Nothing in this section shall be construed to require a court to reduce any sentence pursuant to this section.")


### A. Covered Offense

The First Step Act limits eligibility to "covered offenses." *See* PL 115-391 § 404. When Johnson was charged, tried, and sentenced, the statutory sentence for possession with an intent to distribute 50 grams or more of crack cocaine was ten years to life. 21 U.S.C. § 841(b)(1)(A) (2003). The Fair Sentencing Act raised the amount of crack cocaine that triggered that statutory sentence from 50 grams to 280 grams. 21 U.S.C. § 841(b)(1)(A) (2019). The Fair Sentencing Act set the statutory penalty for more than 28 but less than 280 grams of crack cocaine as between five- and 40-years' imprisonment. 21 U.S.C. § 841(b)(1)(B)(iii) (2019). Therefore, Johnson argues, the Fair Sentencing Act modified the statutory penalty for his violation of 21 U.S.C. § 841(a)(1), rendering his offense a "covered offense" under the First Step Act.

The Government argues that Johnson is not eligible for relief under the First Step Act because "the record confirms" that the quantity of crack cocaine "involved" in Johnson's offense was over 280 grams, such that the Fair Sentencing Act would not have modified the applicable statutory penalty. (Gov.'s Resp. at 5, Dkt. No. 240.) The Government cites to the following aspects of the "record" to support its position: (1) the Presentence Investigation Report ("PSR") that the U.S. Probation Office prepared prior to Johnson's sentencing, in which the Probation Office wrote that Johnson was "found guilty of possession and/or distributing and conspiring to distribute approximately one kilogram of cocaine base and one kilogram of cocaine" (Gov.'s Resp. at 3); and (2) the sentencing court "found ... that [Johnson] was responsible for one kilogram of cocaine and one kilogram of crack cocaine." (Gov.'s Resp. at 5.) Thus, the Government asserts that Johnson's violations "involv[ed] crack cocaine quantities that exceeded 280 grams" (Dkt. No. 240 at 5), rendering his offenses ineligible for the reduced statutory penalty brought about by the Fair Sentencing Act.

Johnson urges that the Government's interpretation of the First Step Act is wrong on the facts and the law. First, as to the facts, Johnson asserts that the Government's position is erroneous because neither the jury nor the sentencing court found Johnson responsible for a specific quantity of crack cocaine above 50 grams. Johnson is right. Johnson was charged via indictment with conspiracy to distribute, and distribution of, "in excess of 50 grams of [crack cocaine]." (Indictment at 1, 7, Dkt. No. 17.) The jury found Johnson "guilty as charged in the Indictment," and in an interrogatory, found that the amount of crack cocaine involved in the conspiracy to distribute was "more than 50 grams." (Verdict, Dkt. No. 84.) The jury made no specific finding as to any quantity above 50 grams. Furthermore, contrary to the Government's assertion, the sentencing court made no findings regarding a specific quantity of crack cocaine. (*See generally* Sentencing Transcript, Ex. C to Johnson's Reply, Dkt. No. 244.) The sentencing court did not explicitly adopt the findings in the PSR. (*Id.*) That court agreed with the PSR's determination of Johnson's total offense level and criminal history category. (*Id.* at 19:4-24.) However, in sentencing Johnson, the court stated only that it was sentencing Johnson to 360 months "because of the circumstances." (*Id.* at 28:20-22.) It never indicated that it was holding Johnson responsible for one kilogram of crack cocaine.

**\*3** Next, the law. The Supreme Court has held, with limited exception, that any fact that enhances a statutory penalty must be proven beyond a reasonable doubt:

> Any fact that, by law, increases the penalty for a crime is an "element" that must be submitted to the jury and found beyond a reasonable doubt. Mandatory minimum sentences increase the penalty for a crime. It follows, then, that any fact that increases the mandatory minimum is an "element" that must be submitted to the jury.

*Alleyne v. United States,* 570 U.S. 99, 103 (2013) (citation omitted); *see also Apprendi v. New Jersey,* 530 U.S. 466, 476-77 (2000). Recently, district courts have rejected the

Government's position as being contrary to *Alleyne* and *Apprendi*:

> In the government's view ... the drug quantity that matters in determining whether a defendant was sentenced for a "covered offense" within the meaning of the First Step Act is not the statutory quantity in the indictment but the quantity found by the Court at sentencing. ... The government's interpretation of section 404 would preclude a court from granting relief when, as in this case, the record contains a judicial finding of a drug quantity of 280 grams or more of crack cocaine based on a preponderance of the evidence. Today, with limited exception, any fact that enhances a statutory penalty must be proven beyond a reasonable doubt.

*United States v. Allen,* No. 3:96-CR-00149, 2019 WL 1877072, at *2-4 (D. Conn. Apr. 26, 2019).

Interpreting the plain language of the First Step Act, district courts have held that it is "the statute of conviction, not actual conduct, that controls eligibility under the First Step Act." *United States v. Davis,* No. 07-CR-245S, 2019 WL 1054554, at *2 (W.D.N.Y. Mar. 6, 2019); *United States v. Martin,* No. 03-CR-795, 2019 WL 1558817, at *3 (E.D.N.Y. Apr. 10, 2019) (same), *vacated as moot* (Apr. 22, 2019). A district court in *United States v. Pierre,* 372 F. Supp. 3d 17, 22-23 (D.R.I. 2019), explained that delving into the record is inappropriate on a First Step Act motion:

> The Court holds that, in determining whether a defendant is eligible for relief under § 404 of the First Step Act, the sentencing court should look to whether the offense of conviction was modified by the Fair Sentencing Act of 2010 to determine eligibility; it *should refrain from delving into the particulars of the record to determine how this specific defendant committed his or her offense of conviction, and how those facts would have hypothetically affected the charges brought against the defendant under the new statutory regime.*

*United States v. Pierre,* 372 F. Supp. 3d 17, 22-23 (D.R.I. 2019) (emphasis added). The *Pierre* court noted that the Government's approach is "problematic in several ways," mostly significantly, "it effectively requires the Court to employ a prosecutor-friendly 'way-back machine' to conjure how the charge, plea, and sentencing would have looked had the Fair Sentencing Act of 2010 been in effect." *Id.* at 22.

The Court concurs with the growing number of district courts that have rejected the Government's position. Under *Alleyne,* the Government cannot rely on a drug quantity that the Probation Office included in the PSR, when that drug quantity differed dramatically from the quantity found by the jury, to hold Johnson to a higher statutory penalty. Ultimately, statutory penalties are determined by facts submitted to a grand jury, a trial jury, or established by a guilty plea. *United States v. Simons,* 375 F. Supp. 3d 379 (E.D.N.Y. 2019) (interpreting the First Step Act in light of *Alleyne*). In Johnson's case, there simply was not a finding beyond a reasonable doubt that Johnson conspired to distribute *any* specific amount of crack cocaine over 50 grams, let alone a finding that he conspired to distribute 280 grams. The statute that Johnson violated is one for which the statutory penalties were modified by section 2 or 3 of the Fair Sentencing Act. Therefore, Johnson's offense is "covered" under the First Step Act, and he is eligible for a sentence reduction.

### B. Sentence Reduction

**\*4** The Court turns to its determination of Johnson's reduced sentence. Johnson argues that the "career offender" offense level applicable to the lowered 40-year maximum sentence is 34, pursuant to U.S.S.G. § 4B1.1(b)(1). An offense level of 34 combined with Johnson's criminal history category of VI (which remains unchanged), corresponds to a Guidelines range of 262

to 327 months. Johnson requests a new sentence of 262 months, the low end of the new Guidelines range for his offense, because the Court originally sentenced Johnson to 360 months, the then-low end of his 360 months to life range.

Johnson sets forth several arguments in support of a reduced sentence in his case. First, he has been a "model prisoner" during his almost 18 years of imprisonment. To this end, Johnson has submitted a lengthy transcript of classes and programs he has participated in while incarcerated, and states that he has had no disciplinary violations. (*See* Ex. D to Johnson's Reply.) Second, Johnson is now 51 years old. The U.S. Sentencing Commission has found that the "recidivism rate begins to decline substantially" at the age of 50. *See United States v. Tucker,* 356 F. Supp. 3d 808, 810 (S.D. Iowa 2019). Third, Johnson's co-defendants received shorter sentences than Johnson because they were not "career offenders"— Cooper received 240 months and McMillian received 151 months. (*See* Orders Reducing Sentences, Dkt. Nos. 212, 170.) Both have served their time and been released. Fourth, a sentence reduction in this case would achieve the purpose of the Fair Sentencing Act and, undoubtedly, the First Step Act—to reduce sentencing disparities in crack cocaine cases. See *Dorsey v. United States,* 567 U.S. 260, 276 (2012).

The Government does not argue that, if the Court finds Johnson eligible for sentence reduction, Johnson is somehow not deserving of said reduction. Thus, it appears to the Court that the Government does not object to a sentence reduction if Johnson is eligible. Accordingly, and because Johnson has raised several meritorious arguments in favor of a reduced sentence, the Court reduces his custodial sentence from 360 months to 262 months on counts one, two and three, to run concurrently with each other. As Johnson has not requested a reduction in his previously-ordered term of supervised release, the Court leaves his terms of supervised release intact.

### III. CONCLUSION

For the reasons stated herein, Sedgwick Johnson's Motion to Reduce Sentence Under the First Step Act (Skt. No. 240) is granted. The Court reduces his custodial sentence from 360 months to 262 months.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2019 WL 2590951

---

End of Document

© 2019 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 6        *United States v. Stone*, No. 96-CR-403, 2019 WL 2475750 (N.D. Ohio Jun. 13, 2019)

2019 WL 2475750
Only the Westlaw citation is currently available.
United States District Court,
N.D. Ohio, Eastern Division.

UNITED STATES of America, Plaintiff,

v.

Richard STONE, Defendant.

Case No. 1:96 CR 403
|
Signed 06/13/2019

**Attorneys and Law Firms**

Virgil K. Stone, Lisbon, OH, pro se.

Federal Public Defender, Firm Office of the Federal
Public Defender, Edward F. Feran, Office of the U.S.
Attorney, Cleveland, OH, for Plaintiff.

<u>MEMORANDUM OPINION AND ORDER</u>

DONALD C. NUGENT, United States District Judge

 **\*1** This matter comes before the Court upon Defendant,
Richard Stone's Motion to Reduce Sentence Under
Section 404 of the First Step Act of 2018. (ECF #527). The
government filed a Response in Opposition to the motion,
and Defendant filed a Reply. (ECF #528, 529). The
Court held a status conference to address the contested issue
of whether this Court should apply the holding from
*Apprendi v. New Jersey,* 570 U.S. 99 (2013), when it
considers the appropriateness of a sentencing reduction
under the First Step Act. Following that status conference,
both parties filed Supplemental briefing in support of their
position. (ECF #532, 533). The matter is now fully ready
for consideration.

Mr. Stone was convicted at trial of one count of
conspiracy to possess with intent to distribute and to
distribute cocaine and/or cocaine base; one count of
possessing a firearm after a felony conviction; one count
of making a false statement in connection with acquiring
a firearm; and, one count of possessing with intent to
distribute cocaine base. (ECF #178). There is no evidence
that would indicate that the jury made a determination on
the drug amount, but the Court found, prior to sentencing,

that he was responsible for more than 50 grams of cocaine
base, and more than 5 kilograms of cocaine. Based on
this amount Mr. Stone would have been subject to a
statutory term of ten years to life in prison, had he not
also been subject to enhancement for having two prior
felony drug convictions. Because of his prior convictions,
Mr. Stone's statutory sentence increased to mandatory
life imprisonment. See, 21 U.S.C. §§ 841(b)(1)(A) &851
(1997). Consequently, on November 24, 1997, Mr. Stone
was sentenced to life in prison on Counts 1 and 4, to be
served concurrently with a 120 month sentence on Count
2, and a 60 month sentence of Count 3. Mr. Stone has
currently served almost twenty-two years of his sentence.

On December 21, 2018, the First Step Act of 2018 was
signed into law. Section 404 of the Act provides that a
court that imposed a sentence for a covered offense may,
on motion of the defendant, impose a reduced sentence
as if sections Two and Three of the Fair Sentencing
Act of 2010 were in effect at the time the covered
offense was committed. No court shall entertain such a
motion, however, if the sentence was previously imposed
or reduced in accordance with sections Two and Three of
the Fair Sentencing Act, or if prior request made under
this section was denied after a complete review on the
merits. Reductions are not mandatory, but are left to
the discretion of the sentencing judge. See, Pub. L. No.
115-391, Title IV, § 404, Dec. 21, 2018.

Both parties agree that if the Fair Sentencing Act had been
in place at the time of Mr. Stone's original sentencing,
the mandatory sentencing ranges and terms of supervised
release that applied generally to Mr. Stone's offenses
would have been altered. Section Two of the Fair
Sentencing Act of 2010 increased the threshold quantities
that trigger different statutory penalties under 21 U.S.C.
§ 841 (b)(1). Following the implementation of that Act,
offenses involving less than 28 grams of crack cocaine are
subject to a sentencing range of up to 20 years, with an
enhancement to up to 30 years for defendants with a prior
felony drug conviction. Defendants who were found to
have offenses involving between 28 and 280 grams of crack
cocaine are subject to a statutory sentencing range of 5
to 40 years, with a possible enhancement of 10 years to
life if the defendant had a prior felony conviction. For
offenses involving 280 grams or more of crack cocaine,
defendants are subject to a statutory sentencing range of
10 years to life, unless the defendant had a prior felony

drug conviction, in which case the range increased to twenty 20 years to life.

**\*2** In this case, the Presentence Report ("PSR") calculated that Mr. Stone should be held responsible for 492 kilograms of cocaine base. At sentencing, the Court accepted the findings set forth in the PSR. The Court based Mr. Stone's sentence on the applicable guideline range of life in prison, which corresponded to his total offense level of forty-three, and his criminal history category of VI.

The Defendant argues, however, that when considering the application of the First Step Act and the Fair Sentencing Act, this Court is bound to apply the subsequent holdings of the United States Supreme Court, specifically the holding from *Apprendi v. New Jersey*. 530 U.S. 466 (2000) *Apprendi* held that any fact that increases a defendant's penalty, beyond the prescribed statutory maximum, other than the fact of a prior conviction, must be charged in the indictment, submitted to a jury, and proven beyond a reasonable doubt as an element of the crime.[1] *Id.* Courts have subsequently applied *Apprendi* to require that a jury, not a judge must make the determination of whether an offense involves a sufficient quantity of drugs to reach various sentencing thresholds. Later in 2013, the Supreme Court made clear that in order to preserve a defendant's Sixth Amendment right to a jury trial, any fact that increases the statutory mandatory minimum sentence must be submitted to the jury as an element of the offense charged. *Alleyne v. United States*, 570 U.S. 99 (2013).

In contrast, the government claims, that this Court is not required to apply the *Apprendi* holding in its consideration of Mr. Stone's request for a reduced sentence. It argues that this is not a plenary re-sentencing, and the Court should, therefore, consider the changes that may have been affected by the applicable sections of the Fair Sentencing Act, but should view those changes as if they were being applied on the date of the original sentencing, and not with the benefit of any other legislative or constitutional developments that may have occurred since that time. If *Apprendi* is not applied, the government contends that Mr. Stone's term of imprisonment should not be reduced under the Fair Sentencing Act, because his sentence was based on the guideline range that corresponded to his total offense level (43) and criminal history category (VI). That range has not changed with the

implementation of the First Step Act.[2] The government also argues that the mandatory statutory minimum and maximum sentences applicable to the amount of drugs attributed to Mr. Stone in the PSR, as adopted by the Court, was not changed by the Fair Sentencing Act.

The Supreme Court has explained, however, that when it recognizes a constitutional rule, such as the one set forth in *Apprendi* and *Alleyne*, it is not to be treated as new rule created by the Court. Rather it is simply a recognition of a right established by the Constitution that has existed since the adoption of the Constitution. The determination of retroactivity does not alter the existence or "temporal scope of a newly announced right, but [only] whether a violation of the right that occurred prior to the announcement of the new rule will entitle a criminal defendant" to any relief for the violation of that right. *Danforth v. Minnesota*, 552 U.S. 264, 271 (2008). This is to say that allowing judges and not juries to determine what drug quantities have been proven in connection with a distribution offense has always been unconstitutional, even at the time of Mr. Stone's original sentencing. The First Step Act neither directs nor implies that the Court should perpetuate the application of an unconstitutional practice when determining a new sentence that complies with the Act's directives, and many courts faced with the issue have applied the *Apprendi* rule in First Step Act re-sentencings. See, e.g., *United States v. Allen*, 2019 WL 1877072 (D. Conn. Apr. 26, 2019); *United States v. Stanback*, 2019 U.S. Dist. LEXIS 75413, 2019 WL 1976445, (W.D. Va. May 2, 2019); *United States v. Simons*, 2019 U.S. Dist. LEXIS 67964, 2019 WL 1760840, (E.D.N.Y. Apr. 22, 2019); *United States v. Pugh*, 2019 U.S. Dist. LEXIS 49407, 2019 WL 1331684, (N.D. Ohio Mar. 25, 2019).

**\*3** In the instant case, Count One of Mr. Stone's Superseding Indictment charged him with conspiracy to distribute or posses with intent to distribute cocaine base, but did not mention any specific quantity of drugs involved in the conspiracy. Count Four of the Superseding Indictment charged that Mr. Stone "did knowingly possess with intent to distribute approximately 342.44 grams of a mixture and substance containing a detectable amount of cocaine base, crack cocaine." (ECF #529-1, Ex. B). The jury instructions quote this part of the Superseding Indictment, but do not explicitly require the jury to find this or any other amount in order to find Mr. Stone guilty of Count Four. The quantity of drugs is not

listed as an element to the crime, and no further mention of any amount attributable to Mr. Stone is mentioned in the portion of the jury instructions that has been provided to the Court as part of the record. (ECF #529-1). There is no evidence or even assertion that the jury made a finding of any particular quantity of drugs involved in the offence in its verdict, or in an interrogatory. When drug quantity is not both charged in the indictment *and* submitted to the jury as part of the jury instructions the statutory maximum under § 841(b) must be determined without reference to a specific drug quantity. *U.S. v. Westmoreland*, 240 F.3d 618, 632-33 (6th Cir. 2001); *U.S. v. Mouling, 557 F.3d 658, 665 (D.C. Cir. 2009); U.S. v. Rogers*, 228 F.3d 1318, 1327 (11th Cir. 2000).

As the jury instructions in Mr. Stone's case did not require the jury to make a specific finding of any particular drug amount in order to convict Mr. Stone on Counts One or Four of the Superseding Indictment, this court will adopt the lowest drug quantity category when considering Mr. Stone's new sentence under the First Step Act.

Offenses involving less than 28 grams of crack cocaine are subject to a statutory sentencing range of up to 20 years, with an enhancement to up to 30 years for defendants with a prior felony drug conviction. 21 U.S.C. §§ 841(b)(1)(C) & 851 (2018). At the time of sentencing, Mr. Stone had a prior felony drug conviction. Therefore, his statutory maximum, for the lower quantities applicable under *Apprendi*, is 30 years or 360 months, with six years of supervised release.

For the above reasons, this Court GRANTS Mr. Stone's petition for relief. (#527). Mr. Stone's sentences on Counts One and Four are reduced to 360 months of imprisonment, to be followed by six years of supervised release. All other aspects of his original sentence remain intact. IT IS SO ORDERED.

**All Citations**

Slip Copy, 2019 WL 2475750

Footnotes

1  Neither party addresses whether Mr. Stone's total offense level would be lowered if a lesser drug quantity applies following application of the *Apprendi* rule.

2  The Defendant does not argue that this guideline range would be reduced under the First Step Act.

 © 2019 Thomson Reuters. No claim to original U.S. Government Works.

 © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 7       *United States v. Hernandez*, Nos. 93-2198, 93-2199, 1994 WL 36803 (7th Cir. Feb. 8, 1994)

16 F.3d 1226
Unpublished Disposition
NOTICE: THIS IS AN UNPUBLISHED OPINION.

(The Court's decision is referenced in a "Table of
Decisions Without Reported Opinions" appearing
in the Federal Reporter. Use FI CTA7 Rule 53 for
rules regarding the citation of unpublished opinions.)
United States Court of Appeals, Seventh Circuit.

UNITED STATES of America, Plaintiff/Appellee,

v.

Cesar HERNANDEZ and Julio
Gil, Defendants/Appellants.

Nos. 93–2198, 93–2199.
|
Argued Jan. 25, 1994.
|
Decided Feb. 8, 1994.
|
Rehearing Denied March 2, 1994.

Appeal from the United States District Court, for the
Northern District of Illinois, Eastern Division, No. 91 CR
743; James B. Moran, Chief Judge, and James H. Alesia,
Judge.

**Synopsis**
N.D.Ill.

AFFIRMED.

Before CUMMINGS, BAUER and ESCHBACH,
Circuit Judges.

*ORDER*

**\*1** Cesar Hernandez and Julio Gil pleaded guilty to
conspiracy to distribute and conspiracy to possess with
the intent to distribute approximately five kilograms of
cocaine in violation of 21 U.S.C. § 846. Gil was sentenced
to ten years of imprisonment. Due to a prior felony drug
conviction, Hernandez was sentenced to the mandatory
minimum of twenty years of imprisonment. 21 U.S.C.
§ 841(b)(1)(A). On appeal, both Hernandez and Gil
challenge their sentences under U.S.S.G. § 2D1.1, arguing
that the sentencing judges erred in not using the actual

amount of cocaine seized to calculate their base offense
levels.

BACKGROUND
On August 29, 1991, Hernandez met with Sergio Garcia,
a government informant, to discuss a six kilogram cocaine
transaction. According to a DEA report, Hernandez told
Garcia that he was awaiting the arrival of 30 to 40
kilograms of cocaine from Miami, Florida but could
obtain cocaine from another source. He told Garcia that
he would notify him the next day if he could obtain the
cocaine for next day delivery. All subsequent dealings
between Hernandez and Garcia were taped.

In a telephone conversation the next day, Hernandez told
Garcia that "everything's confirmed," and asked Garcia
whether he was coming over now. Garcia responded in
a subsequent phone call that his father (in reality, FBI
agent Rafael Tovar) had just completed a deal and would
not be needing the cocaine until the following week.
When Garcia contacted Hernandez the following week,
Hernandez did not have the cocaine but promised to have
the agreed six kilograms that Friday. The following day,
however, Hernandez told Garcia that he was ready to
produce the six kilograms and that he was "looking at
the books [cocaine] and they have very nice hard covers,
very pretty." The two agreed to meet the next day at a
restaurant, and Hernandez suggested that Garcia could
check the cocaine at Hernandez's friend's apartment near
the restaurant.

Garcia met Hernandez as planned. Hernandez told Garcia
that the cocaine would be delivered to his friend's
apartment nearby. He suggested, however, that they not
go into the apartment until the cocaine had arrived, stating
"cause, you know, it will be five kilos and it takes a while."
After Hernandez and Garcia had waited for some time,
Hernandez suggested that they walk to the apartment "so
that we're not seen standing here for too long." Hernandez
went to a nearby phone booth to make a call. When
he returned, he told Garcia that he had spoken with his
nephew, who was not "one of those," and that "they had
—they got five. At this time, they're ten minutes away. In
case these people don't show up ... then I'll give you five."
Hernandez also told Garcia that he could not contact his
first source. He then had the following conversation with
Garcia:

　　Hernandez: I'll give you five.

Garcia: Uh-huh

Hernandez: "Cause they have five. My nephew has already received it. I'll give you five and if you need the other one, I'll call him for him to go to Berwyn (unintelligible), I also have in the apartment. Understand? The other one.

**\*2** Garcia: In other words, after these or—or total?

Hernandez: No. You—pay me, it's just that I don't have the five.

Garcia: Oh.

Hernandez: You pay me for five.

Garcia: Yes.

Hernandez: And as soon as these people arrive with the six, I'll give them the money and get the six from them. Understand? Then you call me, 'cause it seems that (unintelligible). You call and I—have the other one by Berwyn. Okay? So that—

Garcia: Yes, it's fine that way.

Garcia and Hernandez then went into the apartment to wait for the cocaine. After a short while, Hernandez's cocaine supplier, Joel Barajas, arrived at the apartment and had a conversation with Hernandez outside Garcia's presence. Hernandez subsequently told Garcia that Barajas did not want to bring the cocaine into the house to be tested because "that guy doesn't have any trust ... he wants us to go check it out there, on the street." When asked whether Barajas was going to bring the cocaine, Hernandez stated that Barajas would not tell him because Garcia was not a friend of Hernandez's.

Shortly after, Gil arrived with five separately wrapped packages, each containing approximately one kilogram of cocaine. Agent Tovar, posing as Garcia's father, then entered the apartment to pay for the cocaine. During the transaction, Agent Tovar asked Hernandez about possible future drug deals. He asked Hernandez how much cocaine Hernandez could get him later. Hernandez responded "I can get you more later, if you want.... Whatever you need." When asked whether he could get ten more kilograms, Hernandez stated: "I don't know right now.... I'll have to speak with my friend and see." Agent Tovar's subsequent question as to whether Hernandez could sell

him ten kilograms per week was not answered because of the arrival of the police. The total weight of the cocaine seized was 4991.1 grams without packaging.

Gil entered into a written plea agreement, which stated that he had conspired to "possess with intent to distribute and to distribute five kilograms of cocaine." Although Hernandez also pleaded guilty to conspiracy to distribute cocaine, there was no written plea agreement. At sentencing, Judge Moran found Hernandez responsible for at least five kilograms of cocaine. Although the judge stated that "a 10–year swing on nine grams is appalling," he found that there was no question as to whether Hernandez thought the amount delivered was five kilograms. He also found that Hernandez intended to deliver six kilograms and had every expectation of being able to come up with the last kilogram. He did not take into account the ten or more kilograms Agent Tovar discussed with Hernandez immediately before the arrest.

Judge Alesia, who sentenced Gil, held Gil accountable for five kilograms. The judge found that although Gil did not know that six kilograms were negotiated, he was told and had agreed to deliver five kilograms. The judge also found Gil reasonably capable of producing the additional nine grams to make the weight of the seized cocaine a full five kilograms. Both Hernandez and Gil challenge the amount of cocaine used to calculate their sentences.

ANALYSIS

**\*3** The sentencing court determines the quantity of drugs involved in an offense by a preponderance of evidence, *United States v. Isirov,* 986 F.2d 183, 185 (7th Cir.1993), and we review the sentencing court's finding for clear error. *Isirov,* 986 F.2d at 185; *United States v. Cea,* 963 F.2d 1027, 1030 (7th Cir.1992), *cert. denied,* 113 S.Ct. 281 (1992). Application note 12 to § 2D1.1 of the Sentencing Guidelines provides: [1]

> In an offense involving negotiation to traffic in a controlled substance, the weight under negotiation in an uncompleted distribution shall be used to calculate the applicable amount. However, where the court finds that the defendant did not intend to produce and was not

> reasonably capable of producing the negotiated amount, the court shall exclude from the guideline calculation the amount that it finds the defendant did not intend to produce and was not reasonably capable of producing.

This court has explained that the purpose of this application note is to prevent a defendant from being sentenced "on the basis of idle boasts or braggadocio rather than for the amount of contraband he actually intended to produce ... and was reasonably able to produce." *United States v. Cotts,* No 92–4121, slip op. at 12 (7th Cir. Jan. 7, 1994) (citing *Cea,* 963 F.2d at 1031). The government bears the burden of proving that a defendant has the capability and the intent to distribute the negotiated amount. *United States v. Cedano–Rojas,* 999 F.2d 1175, 1179 (7th Cir.1992).

a. Hernandez

Hernandez claims that he was incapable of producing either the missing nine grams or the sixth kilogram. In support of his claim of lack of access, he cites his own statement during the transaction: "I don't know right now ... I'll have to speak with my friend and see." This ambivalent statement was made, however, in response to Agent Tovar's question about whether Hernandez could get ten more kilograms, not the sixth kilogram. In fact, despite his claim of lack of access, Hernandez was able to obtain five kilograms upon short notice when his first source could not produce the cocaine in a timely basis. His ability to do so suggests that his access to cocaine was not as limited as he now claims.[2]

Similarly, Hernandez's argument that he lacked the necessary funds to get additional cocaine is contradicted by his own argument that he was able to arrange the six kilogram transaction only because Barajas was willing to front the cocaine. There is no evidence suggesting that Hernandez would not be fronted cocaine again. Thus, the district court could reasonably find that Hernandez had the capability to produce either the missing nine grams or the additional kilogram.

With respect to the requirement of intent to produce, Hernandez concedes that the amount of cocaine initially promised was six kilograms. He contends, however, that he intended to deliver only what he actually delivered, that is, 4991.1 grams. He maintains that his statements concerning the sixth kilogram initially promised were mere idle boasts or braggadocio. In support, he referred to the other false representations to Garcia before and during the transaction. When he called Garcia to confirm the six kilogram deal, he allegedly lied about how he was looking at the cocaine and that it looked very nice. He also claims that he falsely represented to Tovar his ability to have Gil get cocaine in Berwyn.

**\*4** Hernandez cites *United States v. Ruiz,* 932 F.2d 1174 (7th Cir.), *cert. denied,* 112 S.Ct. 151 (1991), in which the defendant negotiated to sell two kilograms of cocaine but produced only one. In response to the buyer's inquiry about the other kilogram, the defendant stated, "[i]t doesn't matter, I'll get you the other kilo. And if you want, even ten more I can get." *Id.* The second kilogram was delivered later. This court held that the sentence should have been based on two kilograms, not ten, because the evidence failed to demonstrate that the conspirators really had the requisite intent to produce the ten kilograms. Hernandez argues that like Ruiz, who was not held responsible for the ten kilograms he bragged about, he should not be held responsible for the sixth kilogram.

Hernandez's argument may have been stronger if he had been charged with the ten or more kilograms that he discussed with Agent Tovar. He was held responsible, however, only for the six kilograms that he repeatedly expressed a commitment to deliver during the several conversations prior to his meeting with Garcia. Thus, just as Ruiz was held accountable for the two kilograms he had conspired to sell, Hernandez can be held responsible for six kilograms. *See Cea* 963 F.2d at 1031 ("[o]ur cases make it clear that a defendant will be held responsible for the full amount of drugs he earnestly negotiates to buy or sell.") While Hernandez may have lied about actually having the six kilograms in his possession, there was a firm agreement with a set price and quantity and an arranged location. *Id. Cf. United States v. Reyes,* 979 F.2d 1406 (10th Cir.1992) (no evidence supports finding of "negotiation" or "agreement" where defendant did not discuss the details of the sale but merely agreed to meet later).

WESTLAW © 2019 Thomson Reuters. No claim to original U.S. Government Works.

Moreover, when Hernandez arranged to have his nephew deliver five kilograms, he told Garcia: "I'll give you five and if you need the other one, I'll call him for him to go to Berwyn (unintelligible), I also have in the apartment.... You call and I—have the other one by Berwyn." Again, while Hernandez may have lied about having the cocaine in his apartment or the availability of cocaine in Berwyn at that particular time, he demonstrated an intent to deliver the sixth kilogram. Although no specific time or place was arranged for the delivery of the sixth kilogram, it was not clearly erroneous for the district court to find that Hernandez intended to produce the sixth kilogram later. *See United States v. Macias,* 930 F.2d 567, 570 (7th Cir.1991) (defendant arranged to sell eight kilograms of cocaine but delivered only five and stated that he could supply three additional kilograms by 5:00 p.m. that evening; defendant held accountable for all eight kilograms); *United States v. Buggs,* 904 F.2d 1070, 1078 (7th Cir.1990) (stating that where the defendant "negotiated to sell more than he actually sold, the district court was correct in basing its calculation on the amount negotiated"). *Cf. United States v. Moon,* 926 F.2d 204, 208–10 (2d Cir.1991) (conversations early in the negotiations concerning the availability and price of "one or two" kilograms not sufficient to sustain district court's sentence calculation based on two kilograms, where the evidence revealed that the total amount the buyer actually sought to and did purchase was one kilogram).

**\*5** Hernandez argues that he had considered the transaction complete when 4991.1 grams were delivered, and thus the previous discussions about larger quantities are irrelevant.[3] It is true that § 2D1.4 requires that the "negotiated amount" be considered only when there is an "uncompleted distribution." However, this court has said that "while the application note speaks in terms of an uncompleted distribution, it is well established that it applies to partially completed distributions as well." *Buggs,* 904 F.2d at 1078. Given that six kilograms were initially negotiated and only five kilograms were delivered, it was not clearly erroneous for the district court to consider the transaction "uncompleted."

In any event, as the district court found in the alternative, Hernandez could still be held responsible for five kilograms. Hernandez contends that although he had promised to deliver five kilograms, he intended to deliver only 4991.1 grams. He claims that drug suppliers routinely deliver a little short of the amount promised because

buyers usually would not be able to detect any shortfall until after the removal of the packing material. However, given Hernandez's negotiation of five kilograms and his statements to Garcia about being able to produce at least five kilograms if his source did not show up, the district court could reasonably find that Hernandez had the requisite intent to produce five kilograms. In fact, Hernandez himself described the conspiracy as involving five kilograms. When asked to describe his own criminal conduct during the plea hearing, Hernandez told the court how he arranged "five" kilograms for Garcia. Thus, a reasonable inference is that Hernandez intended to deliver five kilograms.

### b. Gil

The government argues that Gil has waived any challenge to the amount of drugs used by the district court to calculate his sentence because he stipulated in an unconditional plea agreement that the conspiracy involved at least five kilograms of cocaine. The government cites *United States v. Tolson,* 988 F.2d 1494 (7th Cir.1993), in which this court held that the defendant had waived the right to challenge at sentencing the accuracy of the date he joined the conspiracy by pleading guilty to the indictment's conspiracy count. Because the defendant signed the plea agreement knowingly, voluntarily, and without reservation, we said that "we can only assume [the defendant] ... was admitting to all the facts in the indictment." *Tolson,* 988 F.2d at 1501.[4]

While the government's reliance on *Tolson* may be justified if *Tolson* is construed broadly, *Tolson*'s waiver rule applies more appropriately to situations where a defendant is challenging an element of the offense stated in the indictment or the facts constituting such elements, rather than to cases where a defendant is challenging the amount of drugs attributable to him at sentencing after a plea of guilty. The cases cited in *Tolson* do not contradict this observation. *See Tolson,* 988 F.2d at 1507 (concurring opinion) (stating that not one of cited cases in the opinion supports the proposition announced by the majority opinion). For example, *United States v. Savage,* 891 F.2d 145, 150 (7th Cir.1989), held that a defendant, who had pleaded guilty to membership in a conspiracy as charged in the indictment, has relinquished his right to *challenge the conspiracy.* Another example is *McCarthy v. United States,* 394 U.S. 459, 466 (1969), in which the Supreme

Court stated that "a guilty plea is an admission of all the *elements* of a formal criminal charge" (emphasis added).

**\*6** In fact, in *United States v. Isirov*, 986 F.2d 183, 186 (7th Cir.1993), we said that the government was mistaken when it argued that "the defendant ha[d] 'waived' any challenge to the PSR's [presentence report's] allegations by stipulating to those facts in his plea agreement." In *Isirov*, the defendant had pleaded guilty to a conspiracy charge involving "five or more kilograms," but asserted on appeal that the district court erred in relying on the seven kilograms stated in the PSR to calculate his sentence. Although *Isirov* ultimately held that the defendant did not meet his burden to refute the correctness of the alleged facts, for sentencing purposes the factual allegations contained in the indictment are not established irrefutably simply because the defendant pleaded guilty to the indictment.

Section 6B1.4 of the Sentencing Guidelines, which applies to stipulations contained in a plea agreement that are relevant to sentencing, makes clear that while stipulations are expected to be accurate and complete, a court is not bound by a stipulation of facts when sentencing the defendant, "but may with the aid of the presentence report, determine the facts relevant to sentencing." U.S.S.G. § 6B1.4 and comment. Implicit in the proposition that "the district court cannot rely exclusively on the plea agreement stipulations in arriving at a drug quantity," *Isirov*, 986 F.2d at 186, is the idea that a defendant can bring to the sentencing court's attention any factual inaccuracies in the PSR, even though they may be consistent with stipulations in a plea agreement.

*See United States v. Atehortua*, 875 F.2d 149, 152 (7th Cir.1989) (stating that where the plea agreement, the lab report, and the PSR gave inconsistent quantities of drugs defendant distributed, counsel "should have flagged these inconsistencies" for the sentencing judge's attention). Accordingly, we find that for sentencing purposes, Gil has not waived any challenge to the weight of cocaine by pleading guilty to the indictment.

Reaching the merits of Gil's argument, we find that the district court properly held Gil responsible for five kilograms. Gil argues he should not be held responsible for more than what was actually delivered because he did not negotiate the five kilogram deal. This argument is not supportable because Gil was told and had agreed to deliver five kilograms. Thus, it was reasonable for the district court to take the plain meaning of Gil's statement and find that he intended to deliver five kilograms. Gil's claim that he was only capable of producing 4991.1 grams also cannot succeed because he was able to produce 4991.1 grams upon short notice. The district court reasonably could find that Gil would be able to produce another nine grams if the shortage was identified.

### CONCLUSION
For the foregoing reasons, we affirm the district courts' judgments.

### All Citations

16 F.3d 1226 (Table), 1994 WL 36803

### Footnotes

1   This application note was originally found in § 2D1.4, which was deleted by consolidation. U.S.S.G.App. C 447 (Nov. 1992).

2   *United States v. Crespo,* 982 F.2d 483 (11th Cir.1993), offers little to support Hernandez's claim. In *Crespo,* the defendant mentioned sources he had in Atlanta and Miami, negotiated for multiple kilograms of cocaine, but was arrested after only delivering a sample of one-third of a gram. The district court held the defendant accountable only for the amount actually delivered, finding that the negotiations between the defendant and the undercover agent were not sufficient to prove the defendant's capability of actually producing five or three kilograms. The Eleventh Circuit, however, never reached the merits of the case because the government waived the issue.

3   Hernandez cites *United States v. Bryant,* 987 F.2d 1225, 1229 (6th Cir.1992) for the proposition that where a defendant is charged with a completed transaction, "the negotiated amount is no longer relevant." In *Bryant,* however, the defendant was only charged with distribution. In holding the defendant accountable for only the amount delivered at the completion of that particular sale, the *Bryant* court emphasized that the defendant was not charged with attempt or conspiracy. Because Hernandez pleaded guilty to conspiracy, *Bryant* does not support his argument.

4    In so holding, we found *United States v. Gilliam,* 987 F.2d 1009 (4th Cir.1993), factually distinguishable. *See Tolson,* 988 F.2d at 1501. In *Gilliam,* the Fourth Circuit allowed the defendant to challenge the quantity of drugs attributable to him despite the fact that the indictment and guilty plea both stated that the conspiracy distributed 30 kilograms of cocaine. The Fourth Circuit vacated the defendant's sentence based on the fact the indictment did not state what amount was attributable to the particular defendant.

---

**End of Document**                                        © 2019 Thomson Reuters. No claim to original U.S. Government Works.